## Case No. 5,282.

### GAY v. UNION MUT. LIFE INS. CO.

[9 Blatchf. 142;[1] 2 Bigelow, Ins. Cas. 4.]

Circuit Court, D. Connecticut. Sept. 21, 1871.

LIFE INSURANCE—SUICIDE—MORAL CONSCIOUSNESS OF ASSURED.

1. A policy of insurance on the life of a person contained the condition, that, if he should die by suicide, the policy should be null and void, and the insurers should not be liable for the loss. The subject insured died by an act of self-killing, by himself firing a pistol at his head: *Held*, that, if the subject insured, at the time he fired the pistol, was conscious of the act he was committing, intended to take his own life, and was capable of understanding the nature and consequences of the act, the insurers were not liable; that, if the act was thus committed, it was immaterial whether he was capable of understanding its moral aspects, or of distinguishing between right and wrong; and that, if he was not thus conscious, or had no such capacity, but acted under an insane delusion, overpowering his understanding and will, or was impelled by an uncontrollable impulse, which neither his understanding nor will could resist, the insurers were liable.

[Cited in Mutual Life Ins. Co. v. Terry, 15 Wall. (82 U. S.) 583.]

[Cited in Van Zandt v. Mutual Ben. Life Ins. Co., 55 N. Y. 177.]

2. The fact of self-killing being conceded, it was for the party claiming to recover on the policy, to establish that the subject insured was in the condition, when he committed the act, which left the insurers liable.

---

[1] [Reported by Hon. Samuel Blatchford, District Judge, and here reprinted by permission.]

3. The value of the testimony of expert witnesses, considered.

This was an action at law, founded on a policy of insurance on the life of Sheridan Gay, for $5,000, payable, in the event of his death, to his widow, the plaintiff [Ellen M. Gay]. The policy was dated June 3d, 1863, and Gay, whose life was insured, shot himself, in a passenger train, on the Hartford, Providence and Fishkill Railroad, December 10th, 1868. The annual premiums on the policy had been regularly paid. One of its conditions was, that, "in case he shall die by suicide, * * * this policy shall be null and void, and said company shall not be liable for the loss." The company declining to pay the loss, the plaintiff brought this suit. The defendants pleaded the general issue, and, by way of special plea, averred, that Sheridan Gay, whose life was insured, did commit suicide, and that thereby, the policy became void. Issue was joined on these pleas. On the trial, the plaintiff admitted that Gay's life was terminated by self-killing, but denied that the act was "suicide," within the meaning of that word as used in the policy, and contended, that, when he shot himself, he was insane, incapable of distinguishing between right and wrong, and unconscious of the nature and consequences of the act he was committing, and that he was driven to it by a mere blind and irresistible impulse, during a paroxysm of insanity which overwhelmed his reason and will. The defendants, on the contrary, insisted, that the facts clearly proved that Gay, though he might have been under some delusions originating in a painful and guilty secret which he carried in his breast, and which had impaired his health, and, to some extent, unsettled his mind, understood the nature and, at least, the physical consequences of his act, and intended to take his own life; and that, therefore, his act of self-destruction was suicide, within the meaning of the policy, and rendered the policy void.

John T. Wait and Richard D. Hubbard, for plaintiff.

Jeremiah Halsey, Henry C. Robinson, and Daniel P. Tyler, for defendants.

WOODRUFF, Circuit Judge (charging jury). The case to which you have listened so patiently during several days is one of no inconsiderable importance. To the plaintiff it involves the question whether she shall recover the provision which was made for her in contemplation of the loss of him to whom she looked for support, maintenance, and protection; and to the defendants, as claimed by them, and as conceded by the plaintiff, it involves not merely the loss of the money that is demanded, but the construction and effect of an important contract in general use, on the meaning and effect of which rests, as the case may be, their responsibility to great numbers who have effected like insurances with them. This special importance is not, perhaps, very material. It is always important, in courts of justice, that the court and jury should feel that, whether amounts in controversy are great or small, their duty is single, and is to be performed under a serious sense of responsibility, and with the sole purpose to render justice according to the evidence and according to the law.

The action is brought upon a contract by which these defendants, in general terms, and in their principal assumption, agree to pay to the plaintiff five thousand dollars, on the death of Sheridan Gay, and on due notice and proof thereof, but, nevertheless, with a condition, that, if he die by suicide, the policy shall be void, and the obligation, thus assumed in such general phrase, shall be of no force or effect.

It was entirely competent for the parties to the instrument to make just that agreement. Parties to a contract may consent to any stipulation not in violation of law; and, when they voluntarily enter into an agreement, or when they voluntarily annex to an engagement conditions and limitations, they are entitled to have those conditions and limitations observed, according to their true import and meaning. It is not for the court, and it is not for you, to pause in your deliberations, to consider whether such conditions, rightly interpreted, are wise—whether their enforcement is humane—whether, under any circumstances, such enforcement may seem harsh or unkind. It is not for you to yield to considerations suggested by the infirmities, or even misfortunes, of our poor human nature. These considerations belong to the parties who enter into the engagement, who, when agreeing together, consent that their contract shall bear its just construction, and shall, if it be enforced, be enforced according to its proper legal effect. Both are bound by it; and I may add to this, that, upon this trial, as it seems to me, both parties come into court ready and willing to be bound by this instrument, with its conditions. They differ, however, as to its meaning in reference to the facts to which it is be applied; and, next, they differ as to the facts themselves. The plaintiff claims that, Sheridan Gay having died, the sum insured is due to her; and that the circumstances of his death are not within the condition of the contract relieving the defendants from liability to pay the money to her. The defendants, on the other hand, claim that, although the subject of the insurance, the life of Sheridan Gay, is at an end, and he is dead, nevertheless, his death occurred in a manner which is within the meaning of the term "suicide," as that is used in the condition annexed to the policy; and that, therefore, the money, the sum named in the policy, is not due. Each party, plaintiff and defendant, is here asking that this case may be decided according to their legal rights,

neither asking, nor having any right to ask, anything out of pity for the deceased, sympathy for his widow, or regret that the defendants should be subjected to loss. Each is doubtless sincere in the views presented by the respective counsel. It is right that the plaintiff should insist upon payment of the sum insured for her benefit, if it is rightly due to her; and it is right that the defendants, if the money is not payable, should decline to pay it. The officers of the defendants' company would have been derelict in the performance of their duty if they had not resisted the claim of the plaintiff, if they had good reason to believe, and did believe, that the defendants are not liable.

The candor of the counsel, and the distinctness of the uncontradicted evidence, have reduced the subject of examination and decision to two inquiries, one of which is addressed to the court, and the other to you.

The making of the contract, its terms and conditions, the payment of the premium to the defendants, the death of the person whose life was the subject of insurance, and that his death was caused by the physical act of that person, or, in the language of the concession, by self killing, the instrument of that killing being a pistol discharged by himself, the ball penetrating his head and causing death, are all conceded. From this point the parties differ. The plaintiff insists that this self-killing was not "suicide," within the meaning of that term, as employed in the policy; but, on the contrary, that, when Sheridan Gay discharged the pistol, he was insane, by reason of disease, and, at the time, was so far unconscious of the nature and the consequences of the act which he was committing, and so beyond the government of his will, by the pressure of delusion and other blind, ungovernable impulse, as to be incapable of legal understanding, and not the subject of legal responsibility, and, therefore, in judgment of law, incapacitated to do any act which could operate to defeat this policy. The defendants, on the other hand, insist, that, when Sheridan Gay killed himself, he had consciousness enough, sufficient power to choose, understanding sufficiently capable of comprehending what he was doing, and the consequences of his act, to make the act suicide, within the condition of the policy. This exhibits the case as I first stated it. The parties differ as to the meaning of the term "suicide," as employed in the policy, and to be applied to the facts which you may find to be established by the evidence; and they differ as to the actual facts which, in reference to the contract, you ought to find to be established.

The first point of difference, that is to say, the meaning and legal effect of this condition of the policy, is for the court to determine. In regard to that, the duty and responsibility is upon us, and not upon you. With it you have no concern, except to see to it that you accept the instruction of the court, and, in good faith, make it your guide in determining the other question, which is, what facts the proofs do establish. This should be so. The question is a grave one, one upon which just and learned men have differed. If we should err in our instructions to you, the matter can be further considered, and even more deliberately than on this occasion, in this, and if need be, in a higher tribunal; while, if you should make a mistake in the matter, it might be impossible, according to our modes of judicial administration, to prevent the injustice. In the discharge of our duty, we shall not attempt to give a definition of the word "suicide," as employed in this and like policies of insurance, which will necessarily be apt to every supposable case, and cover the whole question, as it may arise in other cases. What we say will be with sole reference to what is conceded or uncontroverted, or which may, perhaps, be found by you to be established, in this particular case. We are not called upon to speak of accidental self-killing, when there is not merely no intention to kill, but every instinct and desire to continue in life is in full force; nor of a choice of the mode of death, when death itself is absolutely certain, as if, to escape the torture of death by gradual burning in a burning ship, the sufferer should cast himself, as an act of choice and will, into the water; nor of a case where erroneous opinions and unbelief of a future leads one (as perhaps it has many) to make the question of life or death, one of mere choice to endure, or not longer to submit to live; nor of a case where the opinions of the subject are such that the question of life or death has no moral aspects whatsoever. Of these, or like cases, we say nothing. Not, however, to intimate any doubt in relation to them, but to say, that the rule we give for your guidance is not given to be applied to them. It is enough, if it be a just rule in this case, whatever more restricted or more comprehensive rule might be necessary, if it be possible, by any rule, to reach and cover all cases. Nor are we called upon, nor do we intend to go, beyond the claim which the defendants make in this case. We understand them to concede, that, if Sheridan Gay, when he fired the pistol, was unconscious of the act, did not intend to take his own life, or was incapable of understanding the physical consequences of the act, then the act was not "suicide," within the meaning of the condition of the policy, and the company are liable. But they claim, that, whether he was capable of appreciating the moral consequences of the act, as an act right or wrong, is immaterial; and their claim, therefore, is, that, if the deceased intended to kill himself, and did kill himself, when capable of understanding the physical consequences of the act, irrespective of its moral bearings, as right or wrong, the defendants are not liable. They further claim, that the contract is governed by the law of Massachusetts, or,

rather, the exposition of the law, applicable to contracts like this, by her judicial tribunals; and that the rule claimed by them here is in accordance with the decisions of the courts of that state. This presents the defendants' view of the construction of the contract. The plaintiff, on the other hand, claims a different signification of the term "suicide" in this policy, and denies that this court is bound to follow the decisions of Massachusetts courts.

Not deeming it necessary for the purposes of this trial, to say anything to you upon the subject, we pass the legal question raised by counsel, whether the decisions of the courts of Massachusetts are controlling upon us, in determining the interpretation or legal effect of this policy. That, if it be a question, is for us and not for you.

We do instruct you, in view of the claims, and of the concessions, expressed or implied, in the positions taken by counsel, that, if Sheridan Gay, at the time he fired the pistol, was conscious of the act he was committing, intended to take his own life, and was capable of understanding the nature and consequences of the act, the defendants are not liable; and that, if the act was thus committed, it is immaterial whether he was capable of understanding its moral aspects, or of distinguishing between right and wrong. And, to give you the alternative, if, on the other hand, he was not thus conscious, or had no such capacity, but acted under an insane delusion, overpowering his understanding and will, or was impelled by an uncontrollable impulse, which neither understanding nor will could resist, then the defendants are liable. Under this alternative view of the liability or non-liability of the defendants, you are to determine the question of fact—What was the condition of Sheridan Gay when he fired the pistol? The defendants' counsel rightly claim, that it is for the plaintiff (having conceded the fact of self-killing) to satisfy you that he was in the condition, when he committed the act, which leaves the company liable, as we have stated the rule.

The plaintiff claims, that the proof does establish that state of insanity, or overpowering influence of delusion, or uncontrollable impulse, which rendered him incapable of committing suicide, within the definition given you. In support of that claim the plaintiff, in the testimony elicited on her behalf, points to his overwork in New York; his failure in health; his consequent depression of spirits; the alleged evidence of disease affecting his head—symptoms, as claimed, not then suggesting derangement, but now denoting its incipient stage; his abandonment of his employment, and subjecting himself to the morbid tendencies of a comparatively idle life; his exposure and over-tasking himself, on his visit to Rochester, and the consequent pain in his head, and fainting, claimed to indicate a diseased condition, in which the head and

brain were involved; his apparently increased debility and dejection on his return; the exhibition of reserve, or less freedom in social intercourse; his more than usual nervous excitement, restlessness, inability to sleep, and alternations of flush and pallor in his countenance; his groundless suspicion and jealousy of his brother-in-law, Mr. Ames; towards the last days of his life, his false hearing, freely commented upon by counsel, and claimed to be the effect of a diseased mind and an unduly excited imagination, suggesting to him what was unreal; his excited sense of hearing, claimed to be shown by his twice hearing, when up stairs, in his room, what was said in an ordinary tone of voice down stairs in the dining room; his restless, wild appearance, starting and looking suddenly, from time to time, as if in expectation or fear of something approaching; his irrational conduct on Friday towards Mrs. Ames and her husband, and especially on Tuesday night; his suspicion of an attempt to poison him, and apprehension of an endeavor to arrest him; his persistent belief that reports were in circulation prejudicial to his character; and, on the last morning, his apparent purpose to ride to Amyville, with his wife to accompany him, causelessly and suddenly abandoned, or, if no such purpose existed, then, his crafty deception practiced on his wife, to elude her, and conceal the purpose or the impulse under which he was acting; his leaving behind him a note intimating that he left from a fear that he should shoot Mr. Ames; his vacillating conduct, in taking the train westward, towards Hartford, leaving the cars at Plainfield; his depressed appearance there; his return towards Moosup without any fixed design, or, at least, expressing a state of indecision; his continuing his journey a little further; the evidence of nervous excitement in the cars; and, finally, his sudden entrance into the ante-room of the car, and the discharge of the pistol at his head.

Although the counsel for the plaintiff insists that there is not any sufficient proof to warrant the submission of the question to you, whether he had been unfaithful to his employers at the time he lived in New York, and had unlawfully taken and appropriated their funds to his own use, the court is of the opinion that there is evidence on that subject which is proper for your consideration; and the suggestion of counsel is pertinent, that such a fact, if proved, would not weaken the force of the other evidence of his insanity, but rather suggests a cause, or, at least, an aggravation, of his disease, and makes his insanity more probable. A guilty conscience, fear of detection, and, perhaps, of punishment and disgrace, exciting his nervous system, stimulating his imagination, and thus increasing or co-operating with physical infirmity—all these, and other indications suggested by counsel, are claimed by the plaintiff to be established by the proofs, and to show that Mr. Gay, when he killed himself, was not in a condition in which he did or could commit

suicide, within the test which we have given for your guidance, but, on the contrary, that he was under the controlling influence of insane delusion, and overwhelmed by a sudden and violent paroxysm, and acted without consciousness or capacity to understand the consequences, and without an intent to effect the result. Whether these facts, relied upon by the plaintiff, are proved, and whether, if proved, they establish the claim of the plaintiff in this respect, is for you to consider and determine.

On the other hand, the defendants, in their presentation of the evidence for your consideration, admit that the testimony shows that Mr. Gay was under an insane delusion. They say that his health was impaired; that he was conscious of being guilty in his transactions with his employers in New York, and, concealing this secret, was in constant dread of discovery, punishment and disgrace; that his nervous system was affected, his imagination unduly excited, a groundless jealousy and suspicion of his brother-in-law were produced, and a delusion, that, by his (Mr. Ames') agency, discovery and disgrace were impending, possessed his mind to such a degree, that he was, in the language of the defendants' counsel, an insane man. But they claim and urge that this insanity, on the subjects to which it related, however produced, was not such as to deprive him of capacity to know and comprehend what he did, or of actual knowledge and intention to do as he did, with a distinct understanding of the nature and consequence of his acts; that, although his judgment was perverted, he acted intentionally, knowing what he did, and his final act of killing himself was with plan, intention and comprehension, such as made him a suicide, as that term has been defined by the court; that, when he thought of the deficiency in his accounts, he understood what were the natural and probable consequences of discovery; that, when, under the influence of his delusion, he thought Mr. and Mrs. Ames were talking upon that subject, and that Mr. Ames had written or was about to write to New York, he understood that discovery would be the result; that, when he meditated or spoke of shooting Mr. Ames, if he had seen him put the letter in the post office, he knew the effect of shooting him, either to prevent the discovery, or to revenge it, or, at all events, that shooting him would kill him; that, when he took the pistol, notwithstanding the remonstrances of his wife, he knew and comprehended how to use it, and understood its effects; that, when he heard the steps of his mother-in-law on the stairs, and alarmed his wife by the fear that he was going to shoot her, and gave the explanation, now conceded by the defendants to have been an insane delusion, that some one was coming to arrest him, he, nevertheless, knew the consequences of shooting the person approaching for such a purpose; that, when he assured his mother-in-law that he would not hurt a hair of her head, he comprehended the fear expressed by his wife, and knew what it would be to shoot her mother; that, when, in his letter to Mr. Ames, he declared that Mr. Ames would know why he got away to avoid shooting him, he comprehended both the consequences of shooting Mr. Ames and the consequences of getting away, and that he intended to accomplish the latter and avoid the former; that his taking the can for oil that morning, his purchase of the cigar, and the payment of his fare, indicated knowledge, intention, capacity and understanding; that even the deception practiced upon his wife, if it was a deception, as has been claimed, is to be explained, either by a purpose to conceal his then existing intention, and avoid inquiry, or to spare himself the pain of a conscious final parting; that, under the influence of fear of discovery and disgrace, and acted upon by the insane delusion that his misconduct had been or would be disclosed, he determined to kill himself; that his appearance at Plainfield, and in the cars, indicates comprehension of the act he was then intending and of its consequences; that the manner in which the act was committed shows not impulse, but determination and deliberation; and, finally, that the evidence does not warrant the conclusion, that any sudden outbreak or paroxysm of violence, overpowering reason, memory or will, made him unconscious of the act he was committing, made him incapable of exercising will or volition, or deprived him of capacity to understand the consequences which would result from the act itself. Now, whether all the facts embraced in these claims of the defendants, and others more fully presented by the counsel, are established by the evidence, and, especially, whether the inferences which they deduce therefrom are warranted or not, it is for you to decide; but, whatever you conclude in that respect, you must bring all the facts, and your inferences, to the test which we have given for your guidance.

Counsel had a right to request us to say, that one who is conscious of the act which he commits, and has capacity to comprehend its nature and consequences, is presumed to intend the results which naturally and ordinarily follow from it; and counsel had a right to ask the court to explain the nature, and to remark upon the force, of the testimony of an expert expressing an opinion upon the case presented by other witnesses.

In the departments of science and the arts, there are many facts and many deductions inferable from facts, which are out of the sphere of the knowledge of men in general. They are not supposed to be understood by the court or by the jury. Men of study, experience and skill in the particular art or science to which a judicial investigation may relate, are permitted to aid, by giving the light which such study, experience and skill will throw upon the subject. Their opinions are stated as deductions which are proved, in such study and experience, to flow from

the facts stated. The confidence placed in such opinions, in ordinary life, illustrates the reason, and, to some extent, the ground, upon which such opinions are permitted to be received and weighed by the jury. If we are ill, we may know how we feel or suffer, and how we have felt or suffered, and may know all that are called "symptoms," and all the visible physical indications; but we do not know the cause or nature of the illness. Our physician, being consulted, declares his opinion, and, to a greater or less extent, according to the nature of the case, and our confidence in him, and the clearness and distinctness of his opinions, we rely upon it. This illustration shows, to some extent, the ground upon which such testimony is permitted and courts of justice receive the opinions of those whose study, experience and skill enable them to deduce inferences and express opinions of which courts and juries are incapable. The value, however, of the opinions of experts differs largely in degree, in different cases. It is of first importance that the facts upon which they are founded be satisfactorily established. In the present case, it does not occur to us that there was any dispute as to the facts in relation to which the expert spoke. It is, next, of importance, that the integrity and skill of the witness be known. I may add here, that no question is made of the competency of the witness who has testified here, or of the confidence due to his integrity. But this is not all. Where the expert states precise facts in science, as ascertained and settled, or states the necessary and invariable conclusion which results from the facts stated, his opinion is entitled to great weight. Where he gives only the probable inference from the facts stated, his opinion is of less importance, because it states only a probability. Where the opinion is speculative, theoretical, and states only the belief of the witness, while yet some other opinion is consistent with the facts stated, it is entitled to but little weight in the minds of the jury.

Testimony of experts of this latter description, and especially where the speculative and theoretical character of the testimony is illustrated by opinions of experts on both sides of the question, is justly the subject of remark, and has often been condemned by judges as of slight value. Like observations apply, in a greater or less degree, to the opinions of witnesses who are employed for a purpose, and paid for their services, who are brought to testify as witnesses for their employers. This last observation has no pertinency to the present case, and is only made for the purpose of explaining the reason why testimony of this sort has been the subject sometimes of such comments as have been made in your hearing. This condemnation is not always applicable. Often it would be unjust. Where an expert of integrity and skill states conclusions which are the necessary, or even the usual, results of the facts upon which his

opinion is based, the evidence should not be lightly esteemed or hastily discredited. But, after all, the question of fact in issue is not for the expert to decide. The question of fact in this case is neither for the expert nor for the court. It is for you to decide, upon your sound judgment, under the oaths which you have taken, to render a verdict according to the whole of the evidence submitted to you for consideration. I, therefore, repeat the test or rule of law by which you are to be guided in determining this case. If Sheridan Gay, at the time he fired the pistol, was conscious of the act he was committing, intended to take his own life, and was capable of understanding the nature and consequences of the act, the defendants are not liable; and, if the act was thus committed, it is immaterial whether he was capable of understanding its moral aspects, or of distinguishing between right and wrong. If, on the other hand, he was not thus conscious, or had no such capacity, but acted under an insane delusion, overpowering his understanding and will, or was impelled by an uncontrollable impulse, which neither understanding nor will could resist, then the defendants are liable, and your verdict must be for the plaintiff.

If, under these instructions, you find for the plaintiff, your verdict will be for the sum of $5,000, with interest from the time the sum insured was payable by the policy, which, for the purposes of the verdict, is conceded to be March 17th, 1869.

The jury found a verdict for the plaintiff.

NOTE [from the original report in 2 Bigelow Ins. Cas. 4]. In a letter from Hon. W. D. Shipman, one of the learned judges before whom this case was tried, he says in reference to this case: "The rule of law laid down in this charge was the result of repeated and protracted consultations between the judges who heard the cause; and we fully agreed on the point as stated by Judge Woodruff to the jury." In the note to Borradaile v. Hunter [2 Bigelow, Ins. Cas. 280], all the cases upon this subject are collected, and the rulings in them stated. See, also, Terry v. Life Ins. Co. [Case No. 13,839], decided the present year.