(55 App. Div. 507.)

### TAIT v. BUFFALO RY. CO.

(Supreme Court, Appellate Division, Fourth Department.   November 20, 1900.)

1. STREET RAILROADS—NEGLIGENCE—QUESTION FOR JURY.

   When plaintiff's intestate was about to drive on a street-car track, he looked towards the east, and could have seen a street car if it had been within 180 feet; but none was then in sight, and he did not discover a car approaching from the east until he was upon the track.  He then whipped up his horse, and passed diagonally across the track.  The car struck the hind wheel, and threw intestate 20 or 25 feet.  The car was running 15 to 20 miles an hour, and the motorman, though he saw the wagon when within 50 to 75 feet thereof, did nothing towards stopping the car or slackening its speed, when, if he had been exercising proper diligence, he would have sooner discovered the wagon.  Held, that deceased's freedom from contributory negligence and defendant street-car company's negligence were for the jury.

2. SAME—CAUSE OF DEATH—DIRECTING VERDICT.

   Where, in an action to recover for injuries received by plaintiff's intestate, alleged to have caused his death, the testimony giving the history of the case and the conditions disclosed by the autopsy were supplemented by the unequivocal opinion of a qualified, reputable medical expert to the effect that decedent's death resulted from the injuries sustained, and that what was designated as acute pneumonia by defendant's experts, and which, according to their testimony, caused decedent's death, was merely congestion incident to the injuries received, it was error to direct a verdict for defendant.

Appeal from trial term, Erie county.

Action by Delia M. Tait, as administratrix, etc., against the Buffalo Railway Company.  From a judgment for defendant and from an order denying a new trial, plaintiff appeals.  Reversed.

Argued before ADAMS, P. J., and McLENNAN, SPRING, WILLIAMS, and LAUGHLIN, JJ.

Eugene L. Falk, for appellant.
Porter Norton, for respondent.

LAUGHLIN, J.   Between the hours of 7 and 8 o'clock in the morning of the 16th day of May, 1899, plaintiff's intestate, while riding in a vehicle on Exchange street, in the city of Buffalo, was thrown therefrom by a collision with one of defendant's cars, thereby sustaining injuries from which it is claimed he died on the 16th day of the following October.·  The action is brought to recover the damages sustained by the widow and children.   Decedent was familar with the locality, and had taken his horse into a blacksmith shop to be shod, and left his wagon under a viaduct which is constructed in the middle of said street, leaving a passage for vehicles and a street-car track upon either side.   The street was practically level, and paved from curb to curb, including the open space under the viaduct.   After having the horse shod, decedent hitched up, took his place on the seat of the vehicle, and looked towards the east,—that being the direction the wagon was facing, —and started to turn to the north and west across the northerly street-car track, evidently intending to drive westerly along the space between the street-car tracks and northerly curb of the street. The car that collided with the wagon came from the east upon this

track. When decedent looked he could have seen the car if it had then been within 180 feet, but the car was not at that time in sight on account of the fact that from the easterly end of the viaduct, which was more than 200 feet distant, the street-car track runs along the middle of the street. As decedent's horse reached the track, the car was from 200 to 250 feet to the east, and decedent had, as described by an eyewitness, "pretty well turned around towards the west before the car came in sight." Apparently he did not discover its approach until it was very near, and he was upon the track. He then whipped up his horse, passing diagonally across the track towards the northwest, and the motorman shouted, "Go ahead! go ahead!" The car struck the hind wheel, throwing the wagon against one of the posts of the viaduct to the south. An eyewitness says that the car hit decedent twice or three times, "bumped up against him," and jumped the track, throwing decedent off the seat and upon the pavement 20 or 25 feet over under the viaduct. The speed of the car was from 15 to 20 miles an hour. At this point vehicles were liable to emerge, as did decedent's, from underneath the viaduct, where it is claimed by defendant that, in consequence of the lowness of the superstructure of the viaduct, the motorman could not, without stooping, see a vehicle coming from under the viaduct until the car came within from 50 to 70 feet thereof. According to the evidence the motorman was looking towards the north to the side of the street while the car was traveling about 200 feet, and until it came within 60 or 70 feet of decedent; and, although the motorman saw the wagon when within from 50 to 70 feet thereof, he did nothing towards stopping the car or slackening its speed. The evidence would have justified a finding that, had the motorman been exercising proper diligence, he would have sooner discovered the wagon upon the track. Upon these facts plaintiff's freedom from contributory negligence and defendant's negligence were questions for the jury. Lawson v. Railway Co., 40 App. Div. 307, 57 N. Y. Supp. 997; Meyer v. Railroad Co., 47 App. Div. 286, 62 N. Y. Supp. 33; Kennedy v. Railroad Co., 31 App. Div. 30, 52 N. Y. Supp. 551; Schron v. Railroad Co., 16 App. Div. 111, 45 N. Y. Supp. 124; Smith v. Railway Co., 7 App. Div. 253, 40 N. Y. Supp. 148; Blate v. Railroad Co., 44 App. Div. 163, 60 N. Y. Supp. 732.

The serious question in the case is as to whether the evidence was sufficient to sustain a verdict that the injuries received by this collision were the proximate cause of decedent's death. The evidence bearing upon this point is too voluminous to be fully stated in an opinion. Suffice it to say that there was evidence which, if believed by the jury, would have justified them in finding as follows: That decedent, who was 32 years of age, strong and well, and had previously always enjoyed good health, was by this accident thrown from the seat of his wagon a distance of 20 or 25 feet, landing on the pavement; that he lay there unconscious for a few minutes, then sat up with assistance, and within about 10 minutes "hopped" unaided into the blacksmith shop, where he sat in a chair, with his hands on his side, until a buggy came, in which he was

taken home; that within an hour he complained to the attending
physician of severe pain in the left side and of pain in the left
ankle, foot, and toe, which were bruised and swollen; that he had
a bruise on the left shoulder and in the region of the left temple,
and a fracture of the sixth and seventh or seventh and eighth ribs,
the parts in that region being bruised, and the skin discolored, but
not abraded, to the extent of a man's hand or $3\frac{1}{2}$ inches wide and
5 or 6 inches long, and covering the lower portion of the heart;
that the physician could "discover the fracture by mobility of ends
of bone, which was very painful above the heart"; that decedent
was coughing, and spitting blood with each expectoration, every
two or three minutes; that two hours later he was suffering "in-
tense pain in both the ankle and the left side, the region of the
ribs," and was still spitting blood; that at 2 p. m. the same day
the pain had stopped to some extent, but he was still spitting blood;
that the spitting of blood was due "to the injury to the lung"; that,
although the physician did not observe the expectoration of blood
after the second day, decedent continued to spit blood more or less
every day until he died,—one witness describing the spitting of
blood as "continuously from the time he was hurt off and on along
until he died," and another, who saw him daily after he was able
to be about, as "all the time from when he began to work again
until he went home" (two days before his death); that decedent was
attended by a physician eight or nine weeks, and remained home
nearly all that time, and the swelling continued in his foot; that
he remained in bed about two weeks, and appeared to the physician
to improve from the first; that the fractured bones were found
united in about four weeks, when an adhesive strip, which had been
put on at the first visit of the physician, to keep the fractured bones
in apposition, was removed, but the discoloration on the surface
remained five or six weeks; that about the sixth or seventh week
decedent began to go out, under the advice of his physician, with
the aid of a cane and crutch; that the ankle remained swollen
to some extent until death; that after eight or nine weeks he began
to do light work, merely driving about, and dealing in horses, but
never thereafter did heavy work; that, after thus resuming light
work, he complained to his physician on several occasions of pain
in his side and cough, saying that "he suffered continually from a
cough," and the physician prescribed for him twice during the
month of August, about three weeks apart, the conditions found on
each occasion being the same; that on said occasions the physician
found the left lung congested to some extent, but no tenderness
there, and attributed the congestion to an ordinary cold, and could
not say whether it subsequently disappeared or not, but he testified
that, although he thought not, it might have been caused by the
previous injury; that lay witnesses observed that on some occa-
sions when decedent spit blood he would get dizzy, and his head
would balance like a man fainting away; that two days before
his death he had a fainting spell, and seemed very faint,—"could
hardly catch his breath, seemed as though his lungs were filling up
with something"; that the day before his death he went out at 11

o'clock, returned to the barn at 3, and to his home at 6 o'clock, and the former attending physician was then summoned, and found decedent apparently suffocating, scarcely able to breathe, coughing, and spitting mucous mixed with blood, lips and face blue, both lungs congested, filled with mucous and blood, pulse about 150, and respiration about 50, and temperature about 102½ degrees; that decedent then complained of intense pain across the region of the chest, severe headache, and constant chills, and did not improve, but grew worse, the spitting of blood continuing and the fever increasing and patient gradually growing weaker that night and next day until midnight, when he died; that the rules of the board of health required that the certificate should give both the direct and contributing cause of death, but the attending physician who filled out and filed a certificate of decedent's death stated acute pneumonia as the cause of death, and gave no contributing cause, and upon the trial gave it as his opinion that it was double acute pneumonia, and that it was not due to the injury, but he further testified that he believed that there was a contributing cause, but that he did not know what it was, and that all pneumonia is due either to a germ or an injury, and that he considered the injury "received over the heart," and that he thought the injury would have something to do with the weakness of the heart indicated by the lungs filling with blood, but he could not say whether or not the injury did have anything to do with it; that an autopsy conducted two days after death showed that the lungs were of a very dark color, and charged with blood in every part; that all parts of the lungs would float in water; that but little fluid was found in the pleural cavities, —about an ounce or two on each side; that when the pericardium was opened it was found to contain from 10 to 12 ounces of fluid of darkish color, and lymph, and the interior of this sac nearest the fractured ribs showed evidences of previous coagulation of blood, or a deposit of pigment from previous effusion of blood, and the surface of the pericardium was roughened, indicating previous inflammation of some standing, the most intense part being nearest the fractured ribs, and its continuation over the heart was very well marked; that the heart was soft, and it collapsed when cut open, and contained two clots of blood,—one made in the throes of death, and the other resulting from coagulation of blood after death; that there was also evidence of injury to the interior of the ribs and the internal surface of the pericardium, with effusion of serum, the inflammation extending slightly into the structure of the heart; that both legs were dropsical around the ankle; that the watery elements of the blood oozed out, making the dropsical conditions, and the blood "stagnated in the lungs and settled down in the posterior part, and was more intense all over decedent's back." A medical expert of ability and standing, who performed the autopsy, and was called as a witness in behalf of plaintiff, gave it as his opinion, in clear and positive language, that decedent's death was caused by pericarditis, —that being the medical name of the inflammation of the pericardium,—and that such inflammation was caused by the injury to the ribs sustained at the time of the accident; that the softening of the

heart was caused by this inflammation, which extended into the heart; that there was no valvular lesion of the heart, and no heart disease, and, in his opinion, no other way to account for the condition of the heart and the pericardium; that the blue lips were symptoms of heart failure, and not of acute pneumonia in the first stages; that pneumonia is not congestion, but an inflammation, of the lungs, and that, if this had been pneumonia, the parts of the lungs inserted in water would have sunk, instead of floated; and that the existence of pneumonia was also disproved by the fact that it does not affect the entire lungs, whereas, excepting as the blood had settled in the posterior part of the lungs, the conditions found were the same all over; and that the dropsical condition and contents of the lungs were incident to and resulted from the injury to and inflammation in the pericardium and heart, which showed that towards the end of life the heart was too weak to pump the blood through the lungs and around the body. He further testified that, inasmuch as the inflammation to the pericardium might have resulted from other causes, the autopsy was thorough and complete to demonstrate that there was no other cause excepting the injury. Three eminent experts were called by defendant, and in answer to hypothetical questions, and, of course, basing their opinions solely upon the facts recited in such questions, they stated that, in their opinion, double pneumonia, with acute pericarditis or pericardial complication, was the cause of death. They also gave it as their opinion that the pneumonia was caused by a germ, and that the same germ or the pneumonia poison caused the pericarditis. They conceded that the injury might have caused the pericarditis, but were of opinion that, while chronic pericarditis would hasten death, it would not cause the acute congestion of the lungs; and they disagreed with the opinions advanced by the expert called by the plaintiff in other respects.

The value of the expert testimony depended entirely upon whether the hypothetical questions embodied all the material facts relating to the history of the case and revealed by the autopsy which the jury would have been warranted in finding. Brehm v. Railway Co., 34 Barb. 256; Feeney v. Railroad Co., 116 N. Y. 375, 22 N. E. 402; Klein v. Railroad Co., 54 Super. Ct. 164; Gay v. Insurance Co., 9 Blatchf. 142–154, Fed. Cas. No. 5,282; Cornish v. Insurance Co., 74 N. Y. 295; Getchell v. Hill, 21 Minn. 464–471; Clark v. State, 12 Ohio, 483; Watson v. Anderson, 13 Ala. 202. It is contended with much force and reason that the hypothetical questions upon which the experts called by defendant gave their opinion as to the cause of death did not contain a fair presentation of the case, and conveyed the impression that decedent recovered from the injury, and omitted to recite that he constantly complained of pain in his side, in the vicinity of his heart, and that he coughed and spit blood daily from the time of the accident until his death; and it erroneously recites that he complained to his physician in August of having a cold, and omits the fainting spell which he had a few days prior to his death, and the weak and dizzy condition he was in on occasions when coughing and spitting blood, as described by the lay witnesses, and also some of the evidence of the old internal injury, and of the ef-

fect thereof, as shown by the autopsy. This was not a case where the testimony of experts was controlling upon the judgment of the jurors. As has been seen, the testimony of the experts was diametrically opposed, and it was, therefore, for the jury to say which opinion seemed best supported by reason and the probabilities of the case. The facts upon which the opinions were given are such as every juror is more or less familiar with. The jurors could summon to their aid, in determining what was probable and true from these conflicting opinions of experts, their own general knowledge and observation. The testimony giving the history of the case and the conditions disclosed by the autopsy related to facts which became established if the jury deemed the witnesses credible; and their credibility, if attacked, was for the jury. This evidence was entitled to great weight in determining the cause of death. Record v. Village of Saratoga Springs, 46 Hun, 448; Id., 120 N. Y. 646, 24 N. E. 1102; Geiler v. Railway Co., 11 Misc. Rep. 417, 32 N. Y. Supp. 254. The nature and character of the evidence relating to the history of the case and the autopsy was such that, when supplemented and supported by the unequivocal opinion of a qualified, reputable medical expert, to the effect that decedent's death resulted from pericarditis, which was caused by the injuries sustained in consequence of the accident, and that what is designated as acute pneumonia by defendant's experts was merely congestion incident to the pericarditis, it became a question of fact for the jury to decide whether the injuries received were the proximate cause of decedent's death. Turner v. Railroad Co., 41 App. Div. 213, 58 N. Y. Supp. 490; Hurley v. Brewing Co., 13 App. Div. 167–171, 43 N. Y. Supp. 259; Purcell v. Lauer, 14 App. Div. 33, 43 N. Y. Supp. 988; Lyons v. Railroad Co., 89 Hun, 374, 35 N. Y. Supp. 372, affirmed in 152 N. Y. 654, 47 N. E. 1109; Weber v. Railroad Co., 12 App. Div. 512, 42 N. Y. Supp. 789; Beauchamp v. Mining Co., 50 Mich. 163, 172, 173, 174, 15 N. W. 65.

In the Hurley Case, supra, the rule as to the proximate cause of death is well stated by Justice Bradley as follows:

"It is not sufficient that the plaintiff's intestate may not have died when she did die if the injury had not been received by her. Nor is it necessary to the proximate cause of the act which produced the injury that different physical conditions followed, resulting in death, if there was an unbroken connection between it and them. In other words, if there was no intervening, efficient, independent cause to which the death may have been attributed, the effect of death was proximate to the violence as the cause."

If the jury had rendered a verdict in favor of plaintiff, we are of opinion that the evidence was sufficient to sustain it, and it was, therefore, error for the court to direct a verdict in favor of defendant. It follows that the judgment and order appealed from should be reversed, and a new trial granted, with costs to appellant to abide the event. All concur.