BARBARA WEBER, as Administratrix, etc., of FREDERICK WEBER, Deceased, Respondent, *v.* THE THIRD AVENUE RAILROAD COMPANY, Appellant.

*Death caused by negligence — proximate cause — tuberculosis of the knee extending to the lungs and causing consumption — the right of personal representatives to sue is not a survival of the decedent's cause of action — when it arises — when the recovery is not limited to $5,000.*

In order that the administratrix of a deceased person may recover damages resulting from the death of her intestate it is not necessary to show that the injury in question was the only cause of the death ; it is sufficient if it be established that the injury set in motion other causes, which produced the disease and the death, and which, in the absence of the injury, would not have produced death.

What proof is insufficient to justify the court in submitting to the jury the question whether an injury to the knee of a person caused a tubercular condition there, which gradually, and by the operation of natural causes, extended to his lungs and produced consumption which caused his death, considered.

By the death of a person a cause of action existing in his favor because of bodily injury done to him becomes extinct; the right of his personal representatives to recover compensation for loss sustained in consequence of his death is a new cause of action, arising at the time of his death, the damages recoverable in which are different in kind from those which the deceased would have been entitled to recover in his lifetime.

When a person injured in October, 1894, does not die until June, 1895, the right of action resulting from his death is governed by the provisions of the Constitution which took effect January 1, 1895, and the recovery of damages therein is not limited to the sum of $5,000.

The opinion of an expert witness is not to be given, in the decision of the case, the same effect as the direct testimony, to a fact, of a witness who has personal knowledge of it. The expert's testimony is to be viewed in the light of

his general knowledge of the subject and of the particular case, his opportunity for examination as to the facts upon which he bases his opinion, and the sufficiency of the reasons he gives therefor.

WILLIAMS, J., dissented.

APPEAL by the defendant, The Third Avenue Railroad Company, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of New York on the 10th day of February, 1896, upon the verdict of a jury rendered after a trial at a Trial Term of the Supreme Court held in and for the county of New York, and also from an order entered in said clerk's office on the 13th day of February, 1896, denying the defendant's motion for a new trial made upon the minutes.

*William N. Cohen* and *Nathan Ottinger*, for the appellant.

*Wales F. Severance,* for the respondent.

RUMSEY, J.:

Frederick Weber, the plaintiff's intestate, was, as it is said, and as the jury has found, struck by one of the cars of the defendant company on the 9th of October, 1894, and received injuries of considerable severity. He was wounded somewhat about the head, but the most severe injury was a blow upon the knee, which never, as it seems, was cured. After the receipt of these injuries, and in the month of June, 1895, Frederick Weber died, and the plaintiff, as his administratrix, brought this action to recover damages for his death, which she charges was the result of the injuries he received by the collision with the car in October, 1894. The theory of the plaintiff's case is that the injury to the knee caused a tubercular condition of that part of the limb, which, gradually extending to the lung by the action of natural causes, produced the consumption which caused his death, as a direct result of the injuries which he received. The defendant denied that the injury to the knee caused the consumption, and this was the disputed question of fact presented upon the trial and decided by the jury. After the verdict had been rendered, a motion for a new trial was made upon the ground, among others, that the verdict was contrary to the weight of the evidence, and, upon a denial of that motion and the entry of judgment on the verdict, this appeal was taken.

The appellant renews, here, the point it made before the judge at the trial, that the evidence was not sufficient to warrant a verdict in favor of the plaintiff, because it did not justify the jury in concluding that the consumption, which it is conceded was the immediate cause of the death of Frederick Weber, was produced by the injury to the knee received by him at the time of his hurt. Before the plaintiff can recover for the death of this man, she must prove that the injuries he received were the proximate cause of the death. That is to be determined as a question of fact by the evidence given upon the case.

The question always is, was there an unbroken connection between the wrongful act and the injury — a continuous operation? Did the facts constitute a continuous succession of events so linked together as to make a natural whole, or was there some new and independent cause intervening between the wrong and the injury? (*Milwaukee & St. Paul Railway Co.* v. *Kellogg*, 94 U. S. 469.) It is not necessary for the plaintiff, who claims that the injury was the proximate cause of the consumption of which this man died, to show that it was the only cause. It is sufficient if she establishes that the injury set in motion other causes which produced the disease and the death, but which, in the absence of this injury, would not have produced it. (*Pollett* v. *Long*, 56 N. Y. 200.) But this proof on the part of the plaintiff must be made by evidence which establishes the fact, and, unless the evidence is sufficient to show the connection between the immediate cause of the death and the injury received, the plaintiff cannot recover.

The claim here was that the injury to the knee caused a tubercular condition of the limb, and that this tubercular condition gradually, by the operation of natural causes, extended to the lung of Weber and produced the consumption which caused his death. It appeared from the testimony that the wound upon the knee was a bruise, and that there was no cut or laceration sufficient to permit the examination of the joint itself. Whatever breaking of the skin there was was healed shortly after the injury, if, indeed, there was any breaking of the skin at all; so that the fact that there was a tubercular condition of the knee could, in the nature of things, only be established by the performance of an operation upon the knee which would permit an examination of the injured joint, or by the infer-

ences which physicians might draw from what they saw upon the outside. It is in proof, and not disputed, that the knee was swollen and the joint was stiff. Whether that stiffening of the swollen joint was accompanied with a tubercular condition of the joint was the question which lay at the bottom of this inquiry, because if there was no tubercular condition of the joint then there was no foundation for saying that there was tuberculosis at the knee which extended to and fastened upon the lung and produced the consumption. It was sought to establish a tubercular condition of the knee joint by the testimony of physicians who were sworn as experts in the case and testified to their opinions upon that subject. Of course, the opinion of expert witnesses upon a question as to which opinions may properly be given, is competent evidence and it is to be considered in deciding the question of fact, but whether it will be received as sufficient proof depends upon other considerations than those to be regarded where the proof presented is direct testimony to a fact by a witness who has personal knowledge, of it. In the latter case the testimony of the witness, if he is unimpeached and the fact is credible in itself, must be considered, and, unless the witness is contradicted or is so interested in the event of the action that his testimony may properly be regarded with suspicion, his statement under oath of the fact must be taken as sufficient proof of it. But in the case of an expert witness, swearing as to what must necessarily be a matter of opinion, his testimony is not necessarily and finally to be accepted as establishing the fact. The testimony is to be considered in view of the general knowledge of the witness upon the subject as to which he is sworn, his knowledge of the particular case, his opportunity for examination as to the facts upon which he bases his opinion, and the sufficiency of the reasons which he gives for the opinion he has; and if it should appear that his opinion is formed without the aid of facts necessary to enable him to come to a conclusion, that opinion may be disregarded, however confidently it is testified to by the witness.

In this case three physicians were sworn on behalf of the plaintiff. One was Dr. Charles W. Miller, who saw Weber on the day of the accident, and who attended him from the ninth to the fifteenth of October, and describes generally his condition during that time. He found at that time acute synovitis of the right knee, with

swelling and contusion of the muscles and tissues of the right leg. He says that it was a serious inflammation of the knee joint; that the right knee was swollen from two or three inches above the knee, almost down to the ankle. He says that the knee was stiff. He left the patient on the fifteenth of October, by which time the swelling had gone down somewhat and the condition of the knee had improved, but it was still stiff and there was still some inflammation. Dr. Miller never saw Weber after the fifteenth of October, and his testimony does not aid us in an examination of the main question here, except so far as it shows that the disease of the knee immediately followed the hurt which Weber received.

The physician who followed Dr. Miller in attendance upon Weber, and whose testimony is principally relied upon by the plaintiff, was Dr. Hoffman, who attended Weber from the middle of October, 1894, to the middle of March, 1895. He testifies to the condition of the knee; that Weber gradually went into a decline; that there developed a consolidation of the right side of the lung, which became more and more pronounced until it culminated in a rapid consumption, from which Weber died in the early part of June, 1895. He describes the condition of the knee, so far as it could be ascertained from an outside examination, and the jury might have found from his examination that the knee was greatly swollen, that it was stiff, and that there was in the knee joint an accumulation of pus. Upon this last point, however, the evidence of the witness was not perfectly satisfactory, although it may be said that the jury would be justified in concluding from it that there was in the joint pus, which was the result of inflammation. The witness says that he examined the knee joint superficially, by which he means from the outside; that there was an accumulation of some liquid inside of it; that experience teaches a physician the difference between water and pus, and that, by his sense of touch he could decide conclusively and finally as to which it was; and, in examining the case we must, I think, concede that the accumulation about the knee of Weber, which was referred to by Dr. Hoffman, was pus and not merely an accumulation of watery substance which accompanies synovitis. But, conceding that fact, it did not follow, even according to the testimony of Dr. Hoffman, that the condition of the knee was tubercular, and certainly it did not follow that the

consumption which developed in this man was the result of the condition of the knee.

It was made to appear by the testimony, and was not denied, that such a condition of the knee would not be likely to produce tuberculosis in any other part of the body as a direct result unless there was tuberculosis in the knee. Dr. Hoffman said that when there was "tuberculosis in the body the inflammatory product which is carried from one part, or which is present in one part of the body, is associated with other parts of the body in consequence of the circulation of the blood. * * * It is through this exudation, through this deposit in the knee joint which is carried up in the circulation through the blood into the lungs, and in that way the bacilli are provoked to bring on one disease in conjunction with the other." None of the witnesses contradicted this theory of Dr. Hoffman, and Dr. Fowler substantially corroborated it. So it will be seen that there lay at the basis of the plaintiff's case a necessity of proving that the knee was in a tubercular condition, and that, because of this condition, the operation of natural causes produced tuberculosis in the lung. The plaintiff's case failed, therefore, unless it was made to appear that there was tuberculosis of this knee. In making this examination we take no account of the testimony of Dr. Hoffman, which, it may be assumed, was mistakenly given, that there was a consolidation of the lung in October, 1894, which existed before the injury was received, and that the trouble with the lungs acted upon the knee, because that testimony was retracted by him as given under a mistake. But we assume that there was no trouble with the lung developed until after the injury to the knee had been received. Nevertheless, that fact did not even presumptively establish any connection between the injured knee and the diseased lung. Was there then evidence from which it could be said that there was tuberculosis in that knee? Upon that point there was only the evidence of Dr. Hoffman and Dr. McHale. It was conceded on all hands that tuberculosis was not always the result of an injury to the knee. Dr. McHale said that when an injury had been received by the knee there is usually a tubercular condition which arises from it more frequently in the knee than in any other bony structure of the body; but he did not undertake to say that there was a tubercular condition in this man's knee. Dr. Hoffman alone gave testimony

to establish that fact. As we understand this testimony, after a careful examination of it, he bases his testimony upon the fact that there was an accumulation of pus in the knee, and that that was followed by a gradual development of tuberculosis in the lung. He was asked how he knew, by any scientific examination, that there was anything tubercular about the knee, to which his answer was this: " The fact that the man had a consolidation of the right lung and that his knee was anchylosed led me to determine that he had tuberculars deposited in his knee joint and in his lungs. There is a scientific process of finding out whether there is anything tubercular at the knee. I ascertained definitely whether there was anything tubercular at the knee. I absolutely determined whether there was anything tubercular at the knee by this method that I have just explained. I found consolidation of the lung, and there was some trouble there at the knee. I said there was tuberculosis at the knee. That is part of what I call an exact scientific method. I was not called upon to act with the rest of the method; that is sufficient to determine in very many cases. I know there was tuberculosis in the lungs, or something tubercular there, because there was high temperature there, a cavity and loss of flesh and emaciation. They do not have all these symptoms in bronchitis — all these symptoms I have just given you; in broncho-pneumonia, it depends on what kind of pneumonia it is. In the early stages of pneumonia you have consolidation."

The method which he had just explained, by which he determined that there was anything tubercular at the knee, was, as it seems, simply a conclusion that there was pus in the knee joint. But it was made to appear in the case, and was not disputed, that the mere existence of pus in the knee joint was not sufficient to warrant a conclusion that there was tuberculosis there. There could be no tuberculosis unless there were tubercles — and there were not necessarily tubercles where there was pus. This was undisputed in the case, and Dr. Hoffman by no means meets that difficulty, because he said especially that while there was a scientific way of finding out whether the accumulation at the knee was pus or water, and that it was possible to ascertain what the pus contained, he did not take any such means. Dr. McHale, who was also sworn by the plaintiff as a witness, testified that one could, by scientific process, find out

whether there is any tubercular condition of the joints, "provided that you get the tubercles. You can get the fluid, * * * in which the tubercular condition is supposed to exist, but if you don't get pus you don't get the tubercles and you don't get the bloody serum. That would be deposited on the bones and not migrate into the blood or serum."

Dr. Fowler testified that the only way to ascertain whether or not there were tubercles in the pus, was to draw off a portion of the pus and examine it under a microscope, and Dr. McHale's testimony was practically corroborative of that. It is true that Dr. McHale says that when a joint is tubercular there is a means of discovering it by observation, clinical experience and scientific examination of the contents of it, but he testifies practically as has been quoted above, that you can find out whether there is tubercular condition " provided " you can get the tubercles.

It is clearly proven in this case that no such examination of this knee joint was made as to ascertain whether there did exist tubercles upon the joint, and the only evidence that that condition of affairs existed was that Dr. Hoffman, as the result of his outside examination, concluded that there was pus in the joint, and afterwards concluded that the joint was in a tubercular condition, for the reasons, and only for the reasons, contained in his testimony, which has been quoted above. But an examination of that testimony shows that he based his conclusion as to the tubercular condition of the knee joint largely, if not entirely, upon the fact that after this injury there was a diseased condition of the lung — which is a rather remarkable inversion of the process of reasoning. It is quite true that Dr. McHale testified that there was a decided connection between the state of his lung and the state of his knee, scientifically speaking. But that testimony is explained by evidence given just previously, that the injurious effect of the knee upon the general system was to lower the vitality in such a way that if the patient were exposed to the germs of consumption he would contract it; that the condition of his knee would make him more susceptible in every way to the attack of the tubercular germs. He said that a tubercular knee frequently led to tuberculosis of the lungs, but it is almost necessarily to be inferred from his testimony that it led to such tuberculosis for the reason given just above. When Dr.

McHale was recalled, as an expert witness, he was asked in a hypothetical question, whether he could say with reasonable certainty that the death of Weber was caused by his injuries on the ninth of October, by being struck with a car? To which he said, yes. But upon his cross-examination he said, in explaining that testimony, that the injury to the knee would produce pulmonary consumption if there was a predisposition in the patient to tuberculosis. His answer to the hypothetical question is entirely consistent with his testimony given when he was first called, and is fully explained by it, when he said that the effect of the injury to the knee was to lower the man's vitality and to make him more susceptible to contract consumption than he otherwise would have been.

This is practically all the testimony in the case from which the jury would be at liberty to infer that the consumption was the result of the injury to the knee. As it seems to us the testimony was entirely insufficient for that purpose. It was an inference based upon facts which were not shown to exist. The necessary condition of tuberculosis in the knee was entirely unproven by the testimony, and in the absence of that condition a conclusion that the consumption was the proximate result of tuberculosis in the knee cannot be indulged in. If the consumption was caused, as Dr. McHale says it might have been, by so reducing the vitality of the patient as to make him unable to throw off the germs of consumption which attacked him through the lung, the injury would not constitute the first of a continuous succession of events, so as to make the defendant liable for the consumption, because the reception into the lung of germs of consumption from the outside would be a new and independent cause intervening between the injury and the result, for which the defendant would not be liable.

Upon a careful examination of this testimony, we are forced to the conclusion that there was not sufficient proof to warrant the judge in submitting to the jury the question whether the consumption was caused by the injury inflicted by the railway company in the collision. The rule in such cases is that a mere conjecture, built upon a bare possibility, will not suffice to transfer the money or property of one man to the possession and profit of another. (*Pauley* v. *S. G. & L. Co.*, 131 N. Y. 99.) There must be, at least, to warrant such a conclusion, so much testimony that the inference

is reasonable; and when that has not been given, a verdict based upon less testimony cannot be permitted to stand.

We have reached the conclusion, therefore, that it was error to submit this case to the jury upon the testimony which was presented at this trial. That conclusion requires us to reverse this judgment and order a new trial.

But there remains for examination one question which was presented upon the trial and which will be presented when the new trial is had, and will necessarily require a decision. For that reason it is proper that we should decide it.

The amount of the verdict in this case was $6,500, and the amount demanded in the complaint was $20,000. The court was asked to hold that in no event could the plaintiff recover more than $5,000 in the case, and to the refusal so to instruct the jury the defendant excepted. The question presented by this exception is whether the provision of the Constitution which went into effect on the 1st of January, 1895, so affected the right of action in this case as to take away the limit of the right to recover, which before then had been fixed at $5,000. This provision of the Constitution has been so far construed that the courts have held that it is not retroactive and that it does not affect causes of action which had already accrued at the time when it took effect, which was the 1st of January, 1895. (*O'Reilly v. Utah, N. & C. Stage Co.*, 87 Hun, 406; *Isola* v. *Weber*, 147 N. Y. 329.) In each of those cases the injury and the death also occurred before the 1st day of January, 1895, and the question presented was, whether the right of action being perfect at the time the Constitution took effect, the removal of the limitation applied to those actions, and permitted in them a recovery for a greater sum than the former limit of $5,000. Whether those cases are decisive of the case at bar, or whether the reasoning of those cases applies, depends, of course, upon the question whether the cause of action in this case had accrued at the time the Constitution took effect. The right to maintain such an action is comparatively recent in its origin, and takes its rise in this State from the statutes of 1847 and 1849. These statutes were based upon Lord Denman's act, passed by the English Parliament shortly before. Soon after the statutes had been passed, it became necessary for the courts to examine and determine the nature of the

cause of action which was created by them, and the question was presented to the Court of Queen's Bench in England and to the Court of Appeals in this State. It was claimed, on the one hand, that no new cause of action was created by these statutes, but that they operated simply to extend to the personal representative a cause of action which had existed before; in other words, to take away so much of the incidents of the personal cause of action as to permit it to survive the death of the person by whom the injury was received. Following the analogies of that claim, it was asserted that the cause of action was not a new one, but that it was recognized at the common law, had all the common-law incidents, and was to be enforced as any other action arising under the common law. On the other hand, it was asserted that the cause of action was a new one, created solely by the statute, and which did not exist at the common law, but which arose simply by virtue of the statute of the particular State, and that it was not an extension of the right of action of the injured person to which his representative succeeded.

The courts were called upon to decide between these two opposing claims, and the same decision was reached by all of them, although not without strenuous dissent. In the case of *Whitford* v. *Panama Railroad Co.* (23 N. Y. 465) the question was settled so far as this State is concerned. The action there was against the Panama railroad for the negligent killing of a passenger upon their road across the Isthmus of Panama. The complaint was demurred to upon the ground that the cause of action being one created by the law of New York, and unknown to the common law, and the cause of action having arisen in another State, the courts of this State had no jurisdiction over it. The demurrer was sustained in each court, and finally came to the Court of Appeals, where the judgment of the court below was affirmed. The opinion was written by Judge DENIO, who takes occasion to examine critically into the nature of the cause of action; and, following the judgment of the Court of Queen's Bench, he held that the law did not transfer to the legal representative of the injured person, at his death, a right of action which he had possessed, but gave to the representative a totally new right of action on different principles. Judge DENIO says that " the statute does not profess to revive his cause of action in favor of the executor

or administrator. The compensation for the bodily injuries remains extinct, but a new grievance of a distinct nature, namely, the deprivation suffered by the wife and children, or other relatives, of their natural support and protection, arises upon his death, and is made by the statute the subject of a new cause of action in favor of these surviving relatives, but to be prosecuted in point of form by the executor or administrator." Such was the ground of the ruling of the Court of Appeals in the case of *Whitford*, and that ground is strengthened by the fact that it was met, in that very case, by the dissent of Judge COMSTOCK, who refused to agree to the opinion of the court, because he insisted that the cause of action was not a new one, but that it was simply an extension to the personal representative of the former cause of action which existed in behalf of the injured person. The rule thus laid down by the Court of Appeals has never been questioned, and was recognized in the case of *O'Reilly* v. *Utah, N. & C. Stage Company* (*supra*), and that opinion was adopted by the Court of Appeals as a sufficient expression of their views in the case of *Isola* v. *Weber* (147 N. Y. 329), where the same point was decided. (See, also, *Littlewood* v. *Mayor*, 89 N. Y. 24, 27, 30.) The facts show that Weber, having been injured in the month of October, 1894, did not die until June, 1895. Until the day of his death, the right to recover for the injuries which he had received was with him, and such a right died with his person. The right of the plaintiff to recover for the damages caused by those injuries came into existence after his death. It was not a right to recover such damages as would compensate Weber for the pain and suffering which he was obliged to endure because of the injuries which he had received. That right of action was extinct. The right which accrued to the representatives after Weber's death was a right to be paid for the loss which they had sustained, which was the injury resulting to them from his death. (*Blake* v. *Midland Railway Co.*, 18 Adol. & Ell. [N. S.] [Q. B.] 93.) Until, therefore, the death of Weber, the representatives had no right. Their cause of action had not accrued until then, and, when it did accrue, they took it with all the rights which the then existing state of the law gave to them. One of those rights was the right to a recovery for such amount as the jury should think sufficient to compensate them for the loss which they had sustained by the death of the intestate, without a limitation which theretofore

had existed.   The direction of the learned trial judge to the jury, that the limitation of $5,000 had ceased to exist, and that the plaintiff was entitled to recover her full damages, whatever those might be, was correct, and the exception to that direction was not well taken.

But, for the reason that it was error to submit the case to the jury upon the evidence presented, to establish that the death of Weber was owing to these injuries, the judgment and order must be reversed and a new trial ordered, with costs to the appellant to abide the event of the action.

VAN BRUNT, P. J., BARRETT and PATTERSON, JJ., concurred; WILLIAMS, J., dissented.

WILLIAMS, J. (dissenting) :

The action was brought to recover damages for the death of the plaintiff's intestate alleged to have been caused by the negligence of the defendant.

On the 6th day of October, 1894, the intestate, while crossing the tracks of the defendant's road at Eighty-seventh street and Third avenue, was struck by one of the defendant's cars and was thrown down and received the injuries from which his death is alleged to have resulted.   He died June 2, 1895, about eight months after the accident.

The questions as to the nature of the accident, the negligence of the defendant, and the absence of contributory negligence on the part of the intestate, were litigated upon the trial, and were determined by the jury, upon conflicting evidence, and upon this appeal no question is made as to the correctness of such determination.   It is claimed here that the jury were not justified in finding from the evidence that the injuries received by the intestate in the accident caused his death, and that there were errors committed by the court in the reception and rejection of evidence, and in the charge as to this branch of the case, and in respect to the damages claimed and recovered.   There could be no recovery in the case of any damages, unless it was established and found by the jury that the injuries received in the accident caused the death.   (Code Civ. Proc. § 1902.) The plaintiff had the burden of proof upon this issue.   The court charged these propositions clearly, upon the request of the defendant.

The first question here is, whether there was evidence sufficient to support the finding of the jury, that the injuries received *did* cause death. At the time of the accident, seven o'clock in the evening, the intestate, having been struck by the car and thrown down, was picked up and taken into his store near by, and was shortly afterwards taken in an ambulance to the hospital, and soon after was brought back home in a carriage. Two hospital physicians examined him after the accident, during the time he was at the hospital, and testified that they discovered only slight injuries to the knee and ear. Drs. Miller, Hoffman and McHale saw, examined and attended the intestate at various times, between the accident and the death, and gave evidence as to his injuries, his condition, his disease and his death. The plaintiff claimed that the intestate was seriously injured in his knee; that this injury resulted in tuberculosis in the knee, and that this condition spread through the system and extended to the lungs, causing consumption, of which the intestate died.

This claim was based upon the evidence of the three physicians last named, as to the injuries of the intestate, the diseased condition resulting therefrom, and upon their opinion, as experts, as to the death having resulted from the injuries. There was a physician sworn in behalf of the defendant, Dr. Fowler, who gave evidence of an expert nature to combat that given by the physicians sworn for the plaintiff. There was an extended cross-examination of these witnesses, and the defendant claimed that the consumptive condition of the intestate which caused his death existed prior to the accident, and was in no way traceable to the injuries received in the accident.

We need not refer to all the medical evidence in detail. The court submitted to the jury the question as to the cause of death. We conclude that the evidence was sufficient to sustain the finding that the death was caused by the injury to the knee received in the accident.

It is not the province of the court on appeal to consider and weigh the evidence with a view to determining the preponderance in one way or the other. That is the province of the jury. We cannot say that the evidence here was so weak and inconclusive as to call for interference with the conclusion arrived at by the jury.

We find no exceptions to the admission or rejection of evidence calling for a reversal of the judgment. While many such excep-

tions appear in the record, the appellant calls attention to but few, and we think that those were not well taken.

The court charged most of the requests submitted in behalf of the defendant, but refused to charge that the recovery could not exceed $5,000, to which refusal an exception was taken. The verdict was in fact $6,500. This refusal to charge was erroneous and resulted in a verdict which the jury was not authorized to render. The accident occurred prior to the time the constitutional amendment went into effect, January 1, 1895; the death occurred after the amendment had gone into effect. As the law stood prior to January 1, 1895, a recovery in this kind of an action could not exceed $5,000. The amendment provided: "The right of action now existing to recover damages for injuries resulting in death shall never be abrogated, and the amount recoverable shall not be subject to any statutory limitation." (§ 18, art. 1.).

It has been held that this provision of the Constitution has no retroactive effect. (*O'Reilly* v. *U., N. & C. Stage Co.*, 87 Hun, 406; *Isola* v. *Weber*, 147 N. Y. 329.) In these cases the injuries and death were all prior to January 1, 1895, when the amendment went into effect, but the reasons given for the decisions in those cases are equally applicable here. It was said in the *O'Reilly* case, and the reasoning was adopted in the *Isola-Weber Case* (*supra*), that "the effect of the constitutional provision * * * is two-fold; it imposes a greater liability on persons wrongfully or unlawfully causing the death of others, and confers additional benefits on persons in whose favor a right of action is given for such wrongs, and such provisions, whether constitutional or statutory, are seldom construed to have a retroactive effect. * * * 'A law is never to have a retroactive effect, unless its express letter or clearly manifested intention requires that it should have such effect. If all its language can be satisfied by giving it prospective operation, it should have such operation only.' * * * There is no express provision in the Constitution that the section quoted shall affect rights or liabilities arising out of past transactions, nor is there a hint that the section was intended to have a retroactive effect."

The right of action here grew out of the negligent acts of the defendant, which took place prior to the time this provision of the Constitution went into effect. The results of those acts alone

occurred after the time the provision took effect. The defendant was not, after this provision took effect, guilty of any negligent acts upon which this right of action was based, and, therefore, to make the constitutional provision in question applicable to this case, would be to give a retroactive effect to the provision of the Constitution. The reason of this rule is manifestly that one is entitled to know the legal consequences of his negligent acts, when they are committed, that he may be able to understand the results to him of such acts, rather than have forced upon him, after the acts are committed, results or penalties greater than those which existed at the time of their commission. It would give a retroactive effect to the provision to make it import a greater liability upon this defendant for negligently causing the death of plaintiff's intestate than existed when the defendant committed the negligent acts which caused the death. It was clearly erroneous to permit the jury to render a larger verdict in this case than $5,000.

In the course of the charge the learned trial judge used the following language : " The defendant's claim is that the deceased did die of consumption, but that it was due to conditions which existed at the time of the accident, and which were not influenced by the injury to the knee ; that these contusions did produce the condition of the knee, testified to by the physicians as being tuberculosis, but that condition had nothing to do with the subsequent development of consumption." The defendant excepted to the latter part of this language, commencing with the words " that these contusions," but did not except to the first part of the language here quoted.

It is claimed that the court, in the use of this language, incorrectly stated the defendant's position, and, in effect, told the jury that the defendant conceded that the injuries received by the intestate at the time of the accident produced the condition of the knee, which the physicians said was tuberculosis, whereas the defendant claimed all along that there was no tuberculosis of the knee, and that no such condition was produced by the injuries received at the time of the accident. Taking the whole language quoted together, that which was *not* excepted to as well as that which *was*, we fail to see how the jury could have been misled, to the prejudice of the defendant, by this part of the charge.

The court did not intend to convey the idea that the defendant

conceded that there was tuberculosis of the knee, which was produced by the injuries, but that the tuberculosis of the knee, if it existed at all, was not the result of the injuries, but of conditions of the system existing at and before the time the injuries were received. By inserting the word "if" before the words "these contusions," and changing the word "but" to "yet" a little further on, the language would have been literally correct and unobjectionable, and would then have been as follows: "The defendant's claim is that the deceased *did* die of consumption, but that it was due to conditions which existed at the time of the accident, and which were not influenced by the injury to the knee; that if these contusions did produce the condition of the knee, testified to by the physicians as being tuberculosis, yet the condition had nothing to do with the subsequent development of consumption."

This was a fair statement of the defendant's position, and what the language of the charge quoted fairly imported, and what under the circumstances the jury must have understood the learned judge to say. An examination of the record as to what took place upon the trial shows that the defendant's position was clearly taken, and must have been well understood by the court and the jury, and this language in the charge could not well have misled any one even if it was, by a technical and literal construction, not just right. At the close of the charge the defendant, among other numerous exceptions taken, took this exception. There was no specific objection made to the language, that it incorrectly stated the defendant's position. The attention of the learned judge was not called to the technical incorrectness of the language of the charge. If it had been, we cannot doubt but a correction would have been made in the form of the language used, so as to make it just right, inasmuch as it was merely a statement of defendant's theory of the case, which the learned judge must have understood perfectly, and could have had no interest or desire to misrepresent. It is also said that the words "subsequent development of consumption" necessarily suggested that the defendant claimed and conceded that the consumption came upon the intestate after the injuries to the knee were received, whereas the defendant clearly insisted the disease existed before the injuries were received. We think that this contention is hardly correct. It grows out of a misconstruction of the

word " development." This word does not mean caused, induced or created, but it implies a pre-existing condition, which was only subsequently made apparent, visible and known. That the learned judge meant to so use the term is clear from the language first used in the quotation. " The defendant's claim is, that the deceased *did* die of consumption, but that it was due to conditions which existed at the time of the accident, and which were not influenced by the injury to the knee."

It is also said that there was error in the charge as to damages, the jury having been instructed that upon this subject they should consider the earning capacity of the deceased, the business in which he was engaged, and what he was able to earn; what the receipts of the widow and the profits of the business were. That these were proper subjects for the consideration of the jury, when there was evidence with reference thereto, is not disputed, but it is said that there was no such evidence in the case. It did appear in the evidence that the deceased was engaged in the coal business, and the widow testified as to what moneys she received from him.

The only question made here relates to his earning capacity and, as indicative thereof, the profits made by him in the business. The defendant requested the court to charge that, " there is no evidence of the profits of the business of the deceased." And the court so charged, " with the modification that the plaintiff's widow testified that her husband gave her twenty dollars to twenty-five dollars a week." And then in the body of the charge the learned judge said: " You are to consider his earning capacity; the business in which he was engaged, and what he was able to earn. * * * In assessing the damages, the jury, of course, must proceed upon the facts in the case, and reason upon those facts. The testimony of the widow is, that her husband gave her from twenty dollars to twenty-five dollars a week. The claim of the defendant is that that does not show that that money was the profit of his business; that it shows nothing beyond that he received that amount from his business; but what the profits were the evidence does not disclose. It is for the jury to determine from that evidence what his profits were from the business. Of course, the jury must take into consideration the probabilities of business. It would not, of course, be correct to assume that the business would always be prosperous, or that the return

from the business would always be certain." It will be remembered that this evidence was not given for the purpose of enabling the jury, as an element of damage, to include in their verdict any amount as the profits of the deceased's business, but merely as bearing upon the value of the deceased's life, and the compensation for pecuniary injuries, resulting from his death, to the widow and next of kin. It was not necessary that there should be evidence showing just what the profits of the business were, nor precisely what the deceased's earning capacity was. The plaintiff was to give such evidence as she could with reference to the deceased, and the jury were not to figure precisely the amount of damages the widow and next of kin had suffered by reason of the death, but they were to estimate, as well as they were able, the damages, which were, at the best, uncertain and contingent, and could not be proved even with an approach to accuracy. With this understanding of the evidence, and the use to be made of it, we cannot say that the particular language of the charge was improper or misleading. It was, in effect, saying that there was no proof as to the amount of profits made by the deceased in his business, except that the widow testified what he paid over to her from the business per week. Such inferences as the jury could draw from this evidence, they might, not to determine the actual profits of the business, but as bearing upon the value of the deceased's life.

I do not think that this was error for which the judgment should be reversed. I have examined such questions in the case as seem to us to call for consideration, and have arrived at the conclusion that the only error calling upon this court to interfere with the result of the trial is that as to the refusal to limit the verdict of the jury to the sum of $5,000. The court, as to this error, should follow the rule adopted in the *O'Reilly* case (*supra*), and reverse the judgment and grant a new trial, with costs to the appellant to abide event, unless the plaintiff stipulate to reduce the verdict and judgment to $5,000 damages, with interest thereon from the date of the death to the date of the entry of the judgment, in which case the judgment should be modified accordingly, and, as so modified, affirmed, without costs to either party.

Judgment reversed, new trial ordered, costs to appellant to abide event.