## McQUADE v. METROPOLITAN ST. RY. CO.

(Supreme Court, Appellate Division, First Department. June 5, 1903.)

1. EVIDENCE—EXPERT WITNESSES.
   Opinions of expert witnesses must be disregarded, if formed without the aid of facts necessary to enable the witnesses to come to a conclusion.

2. PERSONAL INJURIES—EVIDENCE—SUFFICIENCY.
   In an action for death alleged to have been caused by inflammation of the brain, resulting from the lodgment in that organ of pus formed

in the wrist, which was injured by the negligence of defendant, evidence of expert witnesses considered, and *held* insufficient to show that pus found in the brain was carried there from the injury at the wrist.

Appeal from Trial Term, New York County.

Action by Ellen McQuade, as administratrix, against the Metropolitan Street Railway Company. From a judgment for plaintiff, and from an order denying a motion for a new trial, defendant appeals. Reversed.

Argued before HATCH, McLAUGHLIN, PATTERSON, O'BRIEN, and LAUGHLIN, JJ.

C. F. Brown, for appellant.

T. P. Wickes, for respondent.

PATTERSON, J. The plaintiff's intestate died on the 13th of January, 1902. His death was caused by inflammation of the brain. On the 28th of July, 1901, he was injured by a car which was being operated by the defendant's servants on its railway on Eighth avenue. It was proven that he, with his wife and children, were passengers on the car; that it stopped; that he descended, and was helping one of his little children to alight, when the car prematurely started, and he was struck and thrown down, and received a compound fracture of the wrist. The evidence upon the issues of negligence and contributory negligence was such as required their submission to the jury. The plaintiff had a verdict, and from the judgment entered thereon, and an order denying a motion for a new trial, the defendant appeals.

The difficulty presented in the case arises from the peculiarity of the facts bearing upon the subject of the proximate cause of the death of the intestate. In December, 1901, he had recovered, to all appearances, from the injuries he sustained from the accident. There does not seem to have been anything to indicate, until just previous to his death, that he was suffering from the disease from which he died. Indeed, the existence of that disease does not seem to have been ascertained until an autopsy was had upon him. The evidence shows that he sustained no injury to the head at the time of the accident, but the theory of the plaintiff is that the proximate cause of the death was inflammation of the brain, induced by the lodgment in that organ of pus which had formed in the wound at the wrist, and had been carried to the brain through the lymphatic system. It was incumbent upon the plaintiff to show the direct connection between the injury sustained and the disease from which the intestate died. In a case of this character, that proof must necessarily be made by the testimony of expert witnesses. The matters involved in the inquiry are not those of common knowledge or observation, and, as remarked in Weber v. Third Ave. R. R., 12 App. Div. 515, 42 N. Y. Supp. 789, the testimony of expert witnesses must be considered in view of their general knowledge upon the subject as to which they testify, as well as of the particular case, and of their opportunity for examination of the facts upon which opinions are based, and the sufficiency of the reasons given for such opinions; and, if it should appear that they are formed without the aid of facts

necessary to enable the witnesses to come to a conclusion, the opinions must be disregarded, no matter how confidently they are testified to by the witnesses.

The condition of this record as to the cause of the inflammation of the brain from which the intestate died is so confused and unsatisfactory as to lead to the conclusion that the plaintiff failed to show that the injuries sustained by the intestate on the 28th of July, 1901, were the proximate cause of his death the following January. The evidence does not show satisfactorily, if at all, that pus formed at the wrist; but assuming that some pus did form there, and that it was a possibility that the germ might reach the brain through the lymphatic system, yet it appears that there was another cause to which the presence of pus in the brain might be attributed. The intestate had a disease known as "otitis"—an inflammation of the middle ear. There is proof in the record that he had this disease in the month in which he died. There is also evidence that he had it some years before, but we disregard it, for the witness who testified to it was disqualified by reason of his having been the medical adviser, as he testifies, of the intestate. But the admissible proof given upon this subject showed the existence of otitis, and it is admitted by all the physicians that that is a disease which would lead to inflammation of the brain, and that the formation of pus is incidental to that disease. With these two conflicting theories as to the cause of the inflammation of the brain from which the intestate died, it was for the plaintiff to satisfy the jury by a preponderance of evidence that the direct relation of cause and effect was established between the injuries sustained by the accident and the malady which resulted in death, or that the injuries thus sustained set in motion, aggravated, or in some way made efficient as a cause of death, a disease which, in the absence of the injury, would not have produced death. Pollett v. Long, 56 N. Y. 200. In this case, however, the plaintiff's contention is based only upon the theory of the communication directly of the pus germs from the wound in the wrist to the brain. It is not contended—on the contrary, it is denied—that otitis in any way contributed to the brain disease. Whether the pus was communicated from the wrist to the brain is altogether a matter of opinion, and the value of the opinion of experts depends largely upon the knowledge, the skill, and the professional competency of those whose opinions are given. As said before, the cause of the death of the intestate was ascertained by an autopsy. It was made by three physicians, who testified for the plaintiff. They swear that in making it they did not open the middle ear, although they looked for evidences of inflammation in that neighborhood. They also testified that they found in the fourth ventricle of the brain, which was much distended, 3½ to 4 ounces of turbid fluid, and one of them testified that in that fluid pus was found. He also testified that the normal amount of fluid in that ventricle will vary from 2 to 2½ ounces. One of the other physicians who conducted the autopsy located this fluid, also, as in the fourth ventricle, and one testified that he was unable to tell the situation of the fourth ventricle of the brain—whether it was on the right or left side of the head. It is

made clearly to appear by another physician, a witness for the defendant, whose eminence in the profession is vouched for by the plaintiff's witnesses, that the fourth ventricle will not hold more than a spoonful of fluid; and the chief expert witness for the plaintiff, called in rebuttal, also testified that the fourth ventricle would not hold more than a dram (that is, a teaspoonful); that it is not possible for it to contain such an amount as was testified to by the physicians who conducted the autopsy. But again, the physicians last referred to differ hopelessly among themselves as to the cause of the brain trouble. One of them makes the immediate connection between the wound and the disease by the germs passing though the lymphatic system. The other declares that his theory is that the brain disease was caused by shock consequent upon the accident. Another ascribes the brain disease to the injury of the wrist, but it is impossible to understand from his testimony how he considered the communication was made—only that it was made. It was shown by the defendant's surgeon, who is fully accredited by the plaintiff's witnesses, that shock is but a transitory thing, and has nothing whatever to do with brain inflammation. The two leading experts for the plaintiff admit that otitis could have produced the inflammation. Otitis did exist as a disease.

On the whole evidence, we think that the plaintiff failed to sustain the burden of proof which was upon her to establish that the death of the intestate was the result of the injuries he received through the negligence of the defendant's servants, and that the judgment and order appealed from must be reversed, and a new trial ordered, with costs to appellant to abide the event. All concur.