Henry W. Lengyel, J.
Approximately 134.593 ± acres of claimant’s land were appropriated by the Department of Public Works and the Conservation Department on November 4, 1965, when maps and descriptions were filed in the Essex County Clerk’s office.
The claim in the sum of $1,500,000 was filed with the Clerk of the Court of Claims and the Attorney-General on the 1st day of December, 1965. It has not been assigned.
Claimant was the purported owner of the property by reason of nine deeds which were received in evidence as Exhibits “ 15,” “16,” “17,” “18,” “19,” “20,” “22,” “23,” and “24.” All of said deeds were recorded in the Essex County Clerk’s office except for Exhibit “ 24 ” which was an unrecorded deed from Niagara Mohawk Power Corporation to the claimant herein, dated March 22, 1965.
The claimant contended that it owned certain lands which were designated as the ‘1 former Champlain & Sanford Railroad right of way ” and the “ National Lead Company transmission line right of way.” It was claimant’s position that it had obtained title to said property by conveyance from Frank and Albanie Palmer who held title by right of adverse possession. The State produced four deeds which indicated that Mr. and Mrs. Palmer, and a predecessor in title to one parcel, had conveyed said property to the Champlain and Sanford Railroad and the National Lead Company. These were not grants of a right of way but were outright conveyances, with Mr. and Mrs. Palmer reserving crossing rights over the National Lead Company conveyance. The claimant produced an “ Indenture ” which it had received from the Palmers in 1958 and recorded in the Essex County Clerk’s office. Said “ Indenture ” was a recitation of alleged facts which claimant contended established its title by adverse possession. There was also testimony at the trial from the examination before trial of Frank Palmer relative to this point. In certain circumstances, this court has the right to determine title to real property. (Raquette Falls Land Co. v. State of New York, 156 Misc. 227, 228, affd. 247 App. Div. 837, 838; East Riv. Sav. Bank v. State of New York, 266 App. Div. 494, 498; Graham v. State of New York, 51 N. Y. S. 2d 437.) We cannot, however, determine title as between parties who are not all before the court. This is particularly true when title involves the complicated question of adverse^ possession. The record title, prima facie established by Exhibits “ W,” “ X,” and “ 2 .......... ”, rests in the National Lead Company and the *390 Champlain & Sanford Railroad. These parcels were excepted from the Conservation Department appropriation. It is possible that the Palmers had succeeded to this title by adverse possession but on the record before us we cannot determine that issue. We have not included that acreage in our before or after values or damages.
The State, in its fifth conclusion of law, took the position that: “ The restriction in the deed from Niagara Mohawk Power Corporation to claimant, dated March 22, 1965, would have made it legally impossible for the claimant to use Palmer’s Pond and the dam and the power plant for the generation of electrical energy or for any commercial use or development. [Cases cited.] ” (Italics added.) We refused this proposed conclusion and believe we should explore the State’s erroneous conclusion in some depth. The deed in question (Exhibit “ 24 ”), after describing .the metes and bounds of the property conveyed, stated: ‘1 Reserving, however, unto the party of the first part, its successors and assigns, all water rights and riparian rights of every name and nature in and to the West Branch of the Schroon River flowing through the lands above described, except that the party of the second part, its successors and assigns, may maintain the existing dam so long as .the waters impounded thereby are not used for power purposes or the generation of electric energy. * * * The party of the second part, by the acceptance of this deed, covenants, as a covenant running with the land and binding upon it, its successors and assigns, that said premises should not be used for power purposes or the generation of electric energy.”
The State’s trial counsel stated in his brief, at page 36, that the reservation contained in said deed reserved to Niagara Mohawk Power Corporation “ all water rights and riparian rights to Palmer’s Pond ”. A clear reading of the reservation demonstrated the error in said statement. Moreover, it was an error which apparently influenced to some extent the appraisal of Mr. Grant, who stated in Exhibit “A ”, at page 47: “ Palmer’s Pond (18 acres) has 500' of usable frontage at the easterly end; * * #. The subject (Frontier Town) owns the land under water but does not possess riparian rights and, therefore, has only a scenic amenity. ’ ’ The other State appraiser, Mr. Allard, came to the same conclusion.
As stated in Farnham, Law of Water and Water Rights (vol. II, p. 1565): “A comprehensive statement of the rights of a riparian owner is that he has a right to have the stream remain in place and flow as nature directs, and to make such use of the flowing water as he can make without materially interfering *391 with the equal rights of the owners above and below him on the stream.” (See, also, 6 Warren’s Weed New York Real Property, Water, § 5.01.)
One of the uses that a riparian owner may make of the stream is to dam the flowing water to form a pond for either commercial or recreational purposes, so long as such ponding does not materially interfere with the quantity of water flowing in the stream. Of course, when the pond is formed on the land of the riparian owner of the stream, said owner has the water rights in the pond impounded on his land. (See, 6 Warren’s Weed New York Real Property, Water, § 2.02.)
Niagara Mohawk clearly recognized the difference in the riparian right it had to the stream and the water right to the impounded water on its land. The reservation in the deed explicitly referred to “ all water rights and riparian rights of every name and nature in and to the West Branch of the Schroon River flowing through the lemds above described ” (italics added). Then, in further recognition of the difference, Niagara Mohawk stated that Frontier Town might maintain the existing dam in the flowing stream so long as the impounded waters were not used “ for power purposes or the generation of electric energy.” In other words, Niagara Mohawk was not concerned with claimant’s use of the impounded water except in the two named categories. Any other construction of the clear intent of the language used would be strained and implausible. The State Conservation Department certainly recognized claimant’s right to utilize these impounded waters when it reserved to the claimant the “ right to take water from said Palmer’s Pond and the right to lay, maintain, and repair a pipeline and necessary appurtenances for the purposes of carrying said water to other lands of the reputed owner. * * * And further excepting [sic] to the reputed owner the right to maintain the dam at Palmer’s Pond in its present location.”
We cannot agree with claimant’s counsel that the claimant had .the right to utilize the waters of the West Branch of the Schroon River, within the boundary limits of said Niagara Mohawk deed, or the waters of Palmer’s Pond, to create an electrical theme park attraction in conjunction with the powerhouse, which was located on said property. We are sympathetic to claimant’s position set forth in its brief that: ‘‘ Reservation of riparian rights are strictly construed against the grantor (see, e.g., Findley Lake Property Owners v. Town of Mina, 31 Misc 2d 356, 383 * * *, and the operation of a theme park attraction simply as an exhibit could hardly be said to be the use of water for power purposes or the generation of *392 electric energy in competition with Niagara Mohawk Power Corporation.” However, not only did the Niagara Mohawk deed set forth a clear and explicit reservation hut it also contained a clear and specific covenant which provided that the claimant should not use said premises for power purposes or the generation of electrical energy. As stated in Loch Sheldrake Associates v. Evans (306 N. Y. 297, 304, 305): “ But a reservation or grant in a deed, like every other contract ‘ must be construed according to the intent of the parties, so far as such intent can be gathered from the whole instrument, and is consistent with the rules of law ’ (Real Property Law, § 240, subd. 3). It is only when language used in a conveyance ‘ is susceptible of more than one interpretation ’ that the courts will look into surrounding circumstances, the situation of the parties, etc. (French v. Carhart, 1 N. Y. 96,102; Clark v. Devoe, 124 N. Y. 120, 124; Wilson v. Ford [209 N. Y. 186,] 196 * * *.) ”
See, also, Uihlein v. Matthews (172 N. Y. 154, 159); Schoonmaker v. Hoyt (148 N. Y. 425, 431), and Hall v. Sterling Iron & Ry. Co., (148 N. Y. 432) for a review of the case law.
We find that claimant did not have a legal right to use the waters of West Schroon River and Palmer’s Pond for the purpose of producing power or the generation of electrical energy. We further find that the claimant did not have a legal right to produce power or generate electrical energy on the land and with the improvements encompassed within the Niagara Mohawk Power deed.
We find that claimant had the right to develop the land area bordering on Palmer’s Pond and the impounded waters of said Pond in any manner suitable for Theme Park, commercial or recreational purposes, other than the production of power or electrical energy.
Before the appropriation the property consisted of 408± acres of land plus improvements. Said property was located in the Town of North Hudson in Essex County. The property was in a beautiful section of the Adirondack Mountains and excellent use had been made of it in relation to the natural beauty of the physical setting. We have separated the property into three geographical areas.
Area “ A ” contained 134± acres of land located on the east side of Route 9 with approximately 2,900 feet of frontage on said highway. The frontage was separated into two parcels with 1,350± feet on the south end of said parcel and 1,550± feet on the north end. These two parcels joined to form one parcel of rear land property. Approximately 3± acres of this land were cleared in the south frontage area and had been *393 improved by the construction of a service station. There was a sandpit located in the cleared area. Other portions of the road frontage could have been cleared and improved. However, the area to the rear of the road frontage must be considered wooded mountainous terrain, typical of the Adirondack area.
Area “ B ” contained 232.09± acres of land located on the west side of Route 9 and the south side of Blue Ridge Road. There were 1,400± feet of Route 9 frontage and 4,300± feet of Blue Ridge Road frontage. The area west of Route 9 and east of the Schroon River, the developed area, was located on three descending plateaus. The road frontage was generally at grade with the highway (920± feet above sea level) for a depth of 40 or .50 feet where it sloped gently down to another plateau. Claimant had constructed a motel, parking area and entrance drives on the first plateau. A restaurant-gift shop, entrance buildings, office, warehouses, a 30 foot by 100 foot billboard, large parking area, and a 1± acre swimming pond, had been developed on the second plateau. At the rear of the parking area and entrance buildings the land sloped down to the Theme Park .location (880± feet above sea level) and remaining generally level to the east bank of the Schroon River (860± feet above sea level). The Theme Park developed area contained numerous buildings and improvements.
The land west of the Schroon River and north and immediately south of the West Branch of the Schroon River in Area “ B ” sloped gently uphill to the east end of Palmer’s Pond (880± feet above sea level). Blue Ridge Road runs fairly close to the north boundary of Palmer’s Pond and about 15 feet above the pond level. The south frontage along Palmer’s Pond was above the grade of the Pond but was developable frontage. The land south of this frontage sloped fairly steeply uphill to a high point approximately 1,200 feet above sea level. The east frontage, 500± feet, of the pond was slightly above pond level. There was a total of 3,400± feet of pond frontage. The pond, within claimant’s boundaries, covered 18± acres and extended for a short distance westward onto lands owned by other parties. The improvements west of the Schroon River in Area “ B ”, which we shall refer to hereafter as the Palmer Pond Section, included a one- and two-story frame farmhouse, about 65 years old and in fair condition, with a stone and concrete foundation and full basement and contained six rooms and bath on the first floor and five bedrooms on .the second floor; a one-story frame barn, in fair condition, 1,300± square feet, with an attached horse stall and roofed open shed; four small frame sheds in poor condition; two small frame sheds in fair condi *394 tion; and, a power house, approximately 50 years of age, of frame construction on a poured concrete foundation with water passages built into the foundation. It contained an S. Morgan Smith Co. turbine, 48-inch input, and a General Electric alternating current collector generator, along with a control panel, knife switches, meters, and circuit breakers. There were 23 concrete flume supporters which ran from the powerhouse .to the dam, which impounded the waters of Palmer’s Pond. The dam was of solid concrete anchored to granite gorge walls. It was 20± feet thick at the base and 4± feet thick at the top. Its overall length was 85 ± feet with a spillway of 47± feet. The height of the dam was 40 feet with a water drop of approximately 26 feet. The dam was completed with gauge, geared controls, steel rods and control wheels. There were also about 1.000 linear feet of page and barb wire fencing, 100 linear feet of gravel driveway, a 500-gallon septic tank with leach field and numerous springs throughout this section.
Area “ O ”, contained 41.91± acres, with broken frontage of 1,300± feet on the north side of Blue Ridge Road. Approximately 6± acres of the frontage were reasonably level and developable. This section contained a sand bank with approximately 120.000 cubic yards. The rear lands were mountainous, rising to 1,250± feet above sea level. There were two dirt woods roads leading into the rear lands. The road frontage was generally opposite and across the Blue Ridge Road from the Palmer Pond Section.
There was no zoning in the Town of North Hudson and subject property was in 1965 assessed at $45,685, which was divided into land at $2,290, water rights at $395, and improvements at $43,000. The equalization rate was 26%.
In 1962, the claimant made an application to the Town of North Hudson for a real property assessment revision. In that application the claimant stated that it would sell its property, exclusive of stock and personal inventory, for $200,000 to $225,000. We were not influenced by this 1962 admission. Very apparently the State appraisers also were not influenced by said application. It was made more than three years prior to the appropriation and substantial buildings and improvements were added to the property during this period. Also, Palmer’s Pond was not purchased until March, 1965. As stated in Matter of City of New York (Maxwell) (15 A D 2d 153, 163): “ A certain degree of cynicism is no doubt warranted by the very general practice of landowners who have applied for writs of putting down estimates that vary widely from the claims that they make when the property is about to be condemned. * * * *395 Value is the same regardless of the nature of the proceeding. However, the same property may have different values at different times.” .(Italics added.)
There was a multiple highest and best use for subject property before the appropriation.
(1) Area “ A ” was for commercial development along the road frontage, and marketable timber plus recreational uses such as hunting and camping on the rear land. This land was enhanced by a sand bank.
(2) Area “ B ” was for a Theme Amusement Park operation.
(3) Area “ 0 ” was for development of the Blue Ridge Road frontage for recreational campsites and marketable timber, plus recreational uses such as hunting and camping for the rear land. This land was enhanced by a sand bank.
There was a multiple highest and best use for subject property after the appropriation.
(1) Area “ A ” retained the same highest and best use.
(2) The remainder of Area “ B ” retained the same highest and best use but diminished in quality for reasons which will be set forth below.
Theme Parks are a facet of the outdoor amusement business which either revolve around one particular theme or multithemes, generally related to one underlying concept. Frontier Town was primarily related to the theme of the Old West. However, there was a spin-off value from the felicitous choice of the word, “ Frontier ”, which would permit the claimant to logically add attractions such as Frontiers of Aviation, Frontiers of Industry, etc. Among the more widely known theme parks on a national basis would be “ Disneyland ” and “ Six Flags Over Texas.” On a local basis, we would, perhaps, be more familiar with parks such as the “ Land of Makebelieve,” “ the Enchanted Forest,” “ Santa’s Village,” or “ Fantasy Island.”
The filed maps appropriated 134.593± acres of claimant’s land. Briefly stated, the appropriation comprehended all of claimant’s property west of the thread of the Schroon River and north of Blue Ridge Road.
Subject property was difficult to appraise and damages were difficult to assess.
One of the State’s appraisers, Mr. Allard, found a before value of $648,500, an after value of $624,300, with damages of $24,200, of which $1,050 was consequential. The other State appraiser, Mr. Grant, found a before value of $535,600, an after value of $513,300, with direct damages of $22,300. Neither State appraiser found that the appropriation benefited the remaining property. The State also produced Mr. Lewis of Economic *396 Research Associates, who testified to claimant’s expansion potential.
Mr. Spaulding, claimant’s real estate appraiser, found a before value of $1,800,000, and an after value of $330,000. His appraisal, Exhibit “4 ”, was primarily utilized by the economic consultant, who testified to the before and after values and damages. Mr. Spaulding found that the new highway benefited 10± acres of remaining land along the south side of Blue Ridge Road by $3,500 an acre. Claimant’s economic consultant, Ebasco Services Incorporated, represented by a Mr. Purdy, averaged its three approaches to value and found a before value of $2,121,000, an after value of $383,000, and a rounded damage of $1,740,000. Ebasco also consulted two Theme Park operators, Mr. Monaco and Mr. Uzdavinis, who agreed that claimant’s property was worth more than $2,000,000 before the appropriation and not more than $500,000 after the appropriation. Claimant also produced Mr. Heydinger who testified relative to historical sites and parks; Mr. Frank Palmer who, by examination before trial read into the record, testified to the history of the Palmer Pond Section; and, Mr. McGroodwin, a Theme Park expert.
Neither party was able to produce a whole-to-whole comparable sale of a Theme Park; or, even comparable sales of a portion of a Theme Park. The three real estate appraisers considered the property as a specialty and utilized the summation approach to arrive at their before and after values.
The difficulty in utilization of comparable sales was well illustrated in the trial of the claim.
Mr. Spaulding offered sales in his appraisal, none of which were much larger than 1.5± acres and most of which were less than an acre in size. He also allegedly utilized a series of camp lot sales some distance removed from subject property. In some manner, which was not made clear ,to the court, either by his appraisal or his testimony, he valued the land west of Route 9 and South of Blue Ridge Road before the appropriation at $1,500 an acre plus $49,500 for a gravel pit and top soil. He valued the perimeter land east of Route 9 and north of Blue Ridge Road at $500 an acre plus $24,000 for a sand pit. His after value for the land east and west of Route 9 was $100 an acre plus $15 a lineal foot for the remaining river frontage and $5,000 an acre for 10 ± acres which fronted on the interchange to Interstate Route 87. His after land values were apparently arrived at in the same manner as his before values. It is obvious from the trial record that, in general, Mr. Spaulding gave ,the court the benefit of his naked, unsupported opinion as to these land values. Such is not a proper appraisal procedure. *397 As was pointed out in Katz v. State of New York (10 A D 2d 164, 166): “A mere opinion without factual support is not entitled to great probative force. (Matter of Reihl v. Town of Amherst, 308 N. Y. 212; McQuade v. Metropolitan St. Ry. Co., 84 App. Div. 637.) ” (See, also, County of Warren v. State of New York, 29 A D 2d 717; Fonda, Johnstown & Gloversville R. R. Co. v. State of New York, 29 A D 2d 240, 242; Fredenburgh v. State of New York, 26 A D 2d 966, 967.) We should also point out that his estimate of value for gravel and sand pits reflected what Mr. Bensen and some third party told him. These items of $73,500 represented a flat statement of the alleged value of the gravel and sand deposits. There was no attempt made to consider these deposits as they tended to enhance the value of the land. (See, Matter of Huie, 1 A D 2d 500, 501; Berzal & Co. v. State of New York, 8 A D 2d 886, 887.) We have utilized these comparable sales as they related to the camp site development frontage along the north side of Blue Ridge Road before the appropriation. Other than that, they were of little value in our consideration of this claim.
As previously stated, claimant’s real estate appraiser also found a benefit to 10± acres of land located on the south side of the east interchange to Interstate Route 87 in this location. Again, this was his naked opinion and it has not been given any weight. (See Brand v. State of New York, 46 Misc 2d 645, 649, 650, mod. 26 A D 2d 747, 748, affd. 19 N Y 2d 634; Taken Realty Corp. v. State of New York, 29 A D 2d 1027.) In order to prove benefit, particularly in a rural area, it is our opinion that the appraiser should produce traffic counts and area data which will demonstrate to the trial court the nature of the cross traffic and the importance of the cross road. He should advise us of the proximity of other major highways and the natural and logical termini which will develop more than an impulse desire to lead traffic off the interstate onto the interchange ; or, bring traffic into the interchange in order to use the interstate highway. We drove over Blue Ridge Road to the west in order to reach the Adirondack community of Blue Mountain Lake. It was a sparsely settled area and- a section of the road became a graveled roadway several miles west of the interchange. To the east the interchange leads into Route 9 and one can travel north to the rather small community of North Hudson. The settled areas east of the Interstate and north and south of Frontier Town are more readily accessible from the interchanges north and south of the one at Frontier Town. We could perceive no readily discernible reason why a motorist should utilize this interchange, unless he was a *398 local rural resident or he wished to go to Frontier Town. The obvious reason for the restaurant construction at the interchange by Frontier Town was to combat the denigration of Route 9 by the diversion of traffic caused by Interstate 87, which, in the field of appropriation law, is damnum absque injuria. (Selig v. State of New York, 10 N Y 2d 34, 41.) Claimant should not be penalized for its substantial effort to mitigate what was probably the most serious damage caused the future of Frontier Town by the appropriations. We do not consider this incorrect statement of benefit binding as an admission as to the after value of a 10± acre portion of the subject property.
Both State appraisers utilized essentially the same comparable sales. Although these sales were of more value to the court than claimant’s sales, they also reflected the difficulty of obtaining land sales truly related to the Theme Park highest and best use. The State appraisers also used three improved property sales to support the value of the farmhouse and farm outbuildings taken by the appropriation. The State’s comparables were of value in determining land values east of Route 9, north of Blue Ridge Road, and the mountainous area southeast of the Palmer Pond Section of Area “ B ”. They were also useful in determining the farm building values. However, although more viable than claimant’s comparables when adjusted for Theme Park values, they left much .to be desired. Furthermore, both of the State appraisers incorrectly interpreted the reservation in the Niagara Mohawk deed (supra). They valued Palmer’s Pond only as a scenic amenity to the claimant’s land. However, except as related to power production and the generation of electrical energy, Palmer’s Pond was fully useable for Theme Park purposes. It also had an appreciative effect upon the development frontage on the north side of Blue Ridge Road. Certainly, that frontage could have been conveyed with .the right to swim, fish, and boat in Palmer’s Pond without diminishing the Theme Park use of the 18± acre pond.
The real estate appraisers relied upon reproduction cost to establish the value of the various improvements on subject property. The State appraisers applied depreciation to their cost figures. Both State appraisers applied a 50% depreciation figure to the Theme Park buildings. It is our opinion that these items were in an excellent state of repair and maintenance. A 30% depreciation was more in line with the actualities of the situation. The State appraisers also omitted many items from their cost appraisals. For example, they did not value the airport landing area and approach road, they omitted much *399 of .the extensive site preparation work, a substantial portion of the water and sewage systems, much of the underground telephone and public address systems, and various other items which were not readily observable during a physical inspection of the property.
Claimant’s real estate appraiser, Mr. Spaulding, obviously did not apply any depreciation percentage to his cost figures. Generally speaking, he was a hostile and evasive witness on cross-examination. We believe that he filled the position of an amanuensis rather than an independent expert real estate appraiser.
Much of claimant’s proof related to the value of the Palmer Pond Section as an historical site. During the middle and late 1800’s and early 1900’s, there was a small Adirondack community located in the area of Palmer’s Pond. The community, which had been known as Roth’s Forge, had contained a waterpowered wrought iron forge and separator, .three charcoal kilns, charcoal pits, a waterpowered gristmill, and lumber-mill, a wheelwright shop, a general store and other minor buildings. Iron was produced during this period by the bloomery forge method which was replaced many, many years ago by more efficient methods. It was Mr. Bensen’s testimony that the claimant intended to recreate these various old buildings and to establish an additional Theme Park attraction which would be known as Frontiers of Industry. Exhibits “ 9 ” and “ 26 ” were artistic renderings illustrative of what could have been done in the Palmer Pond Section. We should point out that, in consideration of subject property, we must keep in mind we are in the field of entertainment. Certainly, if we were treating the problem of a real estate subdivision, the production of an artist’s rendering would not be of substantial assistance. However, as stated by Mr. McGoodwin, one of claimant’s Theme Park experts: “ The theme park is a conception of architecture, and the biggest practitioners of the construction of theme parks came from the movie lots and sets, mostly of southern California. They are truly sets. These people are used to drawing a picture of an 1880 log cabin, or an 1890 fire station. They do research and they come up with a rendering as authentic, but as attractive, not necessarily — absolute historical veracity is not what they are after, necessarily. * * *
Now, they have labor, millwrights, and they have foremen, who can take that artist’s rendering and build from it. And I have seen it done not once, but many times.” The above statement incidentally squares with the portion of Mr. Lewis’ testimony wherein he stated that logs could be and were in other Theme *400 Parks chemically treated to create an appearance of age. These two statements point up the fallacy of Mr. Spaulding’s cost testimony relating to log buildings, which was summarized in claimant’s post-trial brief, at pages 48 and 49, as follows: ‘ ‘ With respect to the buildings of log construction, Mr. Spaulding, who had appraised log buildings for the Veteran’s Administration and has personally constructed several log camps (Tr. 973), concluded that aging had caused an appreciation in Claimant’s log buildings (Tr. 972). He testified that the actual cost of attempting to reproduce Claimant’s log buildings with aged logs would be as much as 20 times the cost of construction with new logs and that new logs ‘ would not give the flavor of the rustic times ’ to Claimant’s theme attractions (Tr. 972-974). On this basis, Mr. Spaulding did not depreciate the log buildings. (Tr. 970) ”, We cannot agree with claimant’s position that the ancient fact of Roth’s Forge imparted such an historical flavor to the lands in the Palmer Pond Section as to increase the value or utility of these lands for historical theme park purposes. The testimony of Mr. Heydinger, a National Park Service Historian at Hopewell Village National Historic Site in Pennsylvania, was of interest but was not applicable to subject property. We accept the premise that people are interested in matters historical. We cannot accept the premise that they are more interested in structures, that have to be completely built, because they stand on land that at one time in history contained such structures. At Hopewell Village, there obviously was a restoration of existing historical buildings which dated back to the early 1800’s and late 1700’s. For example, on page 24 of Exhibit “34”, there is a photograph of the wing of a house which had been built “ before 1770.” We must keep in mind that the only structures in the Palmer Pond Section were a farmhouse, farm outbuildings, and a power house and dam built about 1920. All the other buildings had long since disappeared. It is our opinion that recreations of these various items would have been historically interesting on either side of the Schroon River and the fact of ancient situs does not add to this interest and thus to market value. We can perhaps point up the entertainment aspect of the restoration potential by using one of claimant’s future Frontier Theme possibilities. On page 9 of Exhibit “4”, and in other exhibits, reference was made to a maple sugar bush which used to exist south of Palmer’s Pond and the possibility of restoring the ‘ ‘ old-time maple sugar bush. ’ ’ Despite all of the feats of legerdemain which can be accomplished by Theme Park experts, we doubt they can consistently make the sap from maple trees run during the period that this park was open, i.e., May *401 30 to October 12. Thus illusion would have to be substituted for reality and this could be done in areas other than the old historical sugar bush. This is a different situation from that testified to by Mr. McGoodwin, who stated: “ The interest in history and in seeing and touching and feeling things that have historical significance is a major trend in our country and in the attraction business, the public attraction field.” We have added no enhancement to our value figures because of the alleged historical qualities of the Palmer Pond Section.
We do not accept the State’s inferences that claimant bought the Niagara Mohawk property in the path of known proposed appropriations, for the purposes of litigation values. We have no doubt that Mr. Bensen knew Interstate Route 87 was coming and that it would cut across claimant’s western land at some location (see Exhibits “30,” “31,” and “I”). However, claimant did not know the exact highway location and there was absolutely no intimation of the simultaneous Conservation Department appropriation which encompassed 113.91 ± acres of the 134.593± acres appropriated. We know of no case law which requires a landowner to delay in the expansion of his property while he waits in breathless anticipation for the State to make up its mind as to the course it wishes to follow. We point out that most of the appropriated area was purchased in 1956 and it was only the Niagara Mohawk property that was purchased in 1965. We further point out that, when one observes the topography north and south of Palmer’s Pond, it is not difficult to understand its unsuitability for highway purposes. There was no bad faith shown on the part of claimant, or its principal officer, either in land acquisition or in the artistic renderings of late 1964 and early 1965. Demonstrable bad faith is required to sustain the State’s inferences. (See Matter of Mayor, 24 App. Div. 7,10; New York Cent. & Hudson Riv. R. R. Co. v. State of New York, 37 App. Div. 57, 65, app. dsmd. 166 N. Y. 286; Matter of City of New York [West 172d St.], 167 App. Div. 807, 811; Roer Constr. Corp. v. City of New Rochelle, 207 Misc. 46, 52.)
Claimant’s proof of value rested primarily upon the testimony of Mr. Purdy, who employed three valuation approaches in his appraisal report; i.e., sales approach, cost approach, and income approach. He gave the greatest weight to his income approach.
His sales approach was based primarily upon the opinions of Mr. Monaco and Mr. TIzdavinis, two of claimant’s Theme Park experts. These gentlemen were expert in their field, which was the creation and operation of Theme Parks. Their testimony *402 was of assistance to the court as it related to the highest and best use of Palmer Pond Section before the appropriation and the existing successful Theme Park operation. We had to depreciate their testimony to an extent because of their misinterpretation of the electric power utility of the Palmer Pond Section and their incorrect historic site evaluation. Moreover, their testimony as to dollar values before and after the appropriation demonstrated enthusiastic naked opinion estimates. At page B-8, Exhibit “ 3 ”, Mr. Uzdavinis stated: “ To have its future thus damaged may in our opinion, be actually worth its entire value, or over two million dollars, exclusive of personal property and equipment. Not to be ignored is Frontier Town’s aggressive advertising program which each year has seen about $50,000 spent. * * * (after) Indeed, it is a question whether anyone. would then buy Frontier Town, * * *. He could pay between $500,000 and $600,000 for it ”. (Italics added.) Mr. Monaco gave a similarly naked opinion of a value of $2,000,000 before and $500,000 after. Both of these gentlemen also projected annual 30% increases in attendance, if the appropriation had not occurred. We agree with the State that these two interesting and sincerely enthusiastic witnesses 1 ‘ employed a method which can best be described as ipse dixit, which cannot form the basis of a proper evaluation of the subject property.” To the extent that Mr. Purdy placed reliance on these opinions for his sales approach it lacked probative value.
His cost approach was predicated upon Mr. Spaulding’s advice as to land value and reproduction cost “ less depreciation ” of the structures. He added an intrinsic value increment to the Spaulding figures to reflect the Theme Park use. We have previously discussed Mr. Spaulding’s testimony at length and do not wish to belabor that point. To the extent that Mr. Purdy placed reliance on this expert’s opinion, his cost approach must fall.
Mr. Purdy’s income approach was a sophisticated application of claimant’s past economic performance to its future economic possibilities if undisturbed by appropriation — an appraisal method not yet recognized in the field of appropriation law by the courts of this State. (Wer Realty v. State of New York, 26 A D 2d 732, 733; Tarricone v. State of New York, 23 A D 2d 804, 805; Barra v. State of New York, 22 A D 2d 750 ; Hewitt v. State of New York, 18 A D 2d 1128; Levitin v. State of New York, 12 A D 2d 6, 8; 53 Cornell L. Rev. 604, A Reexamination of Value, Good Will, and Business Losses in Eminent Domain.) Claimant’s post-trial brief, Appendix “A ”, sets forth the methodology of the income approach utilized to convert the cash flow projection into an alleged present capital value. A study was *403 made of claimant’s financial statements for the years 1954 through 1965, together with the preliminary figures for the 1966 season. On the basis of this study, plus a field examination of subject property, annual projections of gross sales, cost of goods sold, operating expenses, income taxes and depreciation for income tax purposes were prepared for the period 1967 to 1977. The estimated construction expenditures for planned future improvements and reductions of loans to officers were then deducted from the resultant gross cash flow to establish the estimated net cash flow, which was considered additional working capital. It was then estimated that said additional capital, retained in an investment fund at 2.25% interest, at the end of the 10-year period would total $4,600,647. This capital was discounted at 10% per annum to arrive at an alleged present worth of capital of $1,535,696. To this figure were added the alleged residual values of the land, structures, and improvements of $618,550. After deduction of $60,767 for personal property, the final alleged fair market value on the vesting date was rounded at $2,093,500. Essentially, the same method was followed to arrive at an after value by the income approach of $201,400.
Obviously, there were too many speculative, uncertain, and unproven contingencies contained in the above approach to permit us to give it probative value. The amount of the projected profits depended in great part upon the managerial skills of Mr. Bensen and his associates applied to providing entertainment for the speculative, one might almost say fickle, tastes and desires of the public. The State, of course, did not appropriate these managerial skills or the entertainment requirements of the public. (See, Boynton v. State of New York, 28 Misc 2d 12, 14.) Furthermore, portions of this inherently speculative approach were predicated upon estimates of other experts which were either in error or speculative in and of themselves. For example, Mr. Purdy erroneously assumed that Frontiers of Electricity could have been developed on the land obtained from Niagara Mohawk. He also accepted the essentially naked opinion estimates of Messrs. Uzdavinis and Monaco relative to future attendance increases. Lastly, he accepted the Spaulding reproduction and land values which we have previously discussed. It was of interest to note that the Spaulding appraisal presented a total reproduction cost figure of $1,284,500 before the appropriation of November 4, 1965. Mr. Purdy utilized this same figure as of April 30, 1967.
In urging its income approach, claimant relied on, among others, the cases of Mattydale Shopping Center v. State of New York (279 App. Div. 704, revd. 303 N. Y. 974); St. Agnes *404 Cemetery v. State of New York (3 N Y 2d 37); Levin v. State of New York (17 A D 2d 335, affd. 13 N Y 2d 87); and Diocese of Buffalo v. State of New York (18 N Y 2d 41). We do not consider these cases apposite to the valuation of subject property. The cemetery cases were treating with an absolutely unique type of land with a secure future use. As stated in the St. Agnes decision (supra, pp. 45-46): “The circumstances of an established cemetery are less subject to change than business enterprises, and offer a safe guide to value. * * * Because of the inevitability of death, the demon-
strated experience of the cemetery, the increase in population of the capital district, the future of this cemetery is not subject to variable business factors or dependent upon the exercise of business judgment attending the operation of a gasoline station or planned shopping center or a freight terminal. [Or an amusement Theme Park.] The method used by the court is not a capitalization of hope of expected profits.” In the Matty dale decision (supra) the trial court did not rely upon capitalization of future profits. Bather, it considered the “ clearly to-be-expected future earnings ” (Brooklyn Eastern Dist. Term. v. City of New York, 139 F. 2d 1007, 1013, cert. den. 322 U. S. 747), which were predicated upon the execution of four leases for space in the shopping center which was to have been built. Furthermore, the shopping center plans had been prepared and filed with the Department of Labor and the planned construction work had been let out to bid. When a planned development has been carried out to the degree that a knowledgeable buyer can ascertain with reasonable accuracy the potentiality of a successful development, he, of course, will consider that potentiality in his purchase offer. The trial court must also consider that potentiality in arriving at its fair market value. As stated in Levin v. State of New York (13 N Y 2d 87, 92, supra)-. “We are persuaded that in the circumstances of this case, where the dealings in the property had been crystallized in binding agreement and were on the road to fulfillment, the prospective purchaser in determining the price to pay would have given careful consideration to the first, albeit subordinate, question of prospective rentals ”. This is a far cry from the overwhelming consideration that claimant wishes this court to give to its cash flow projection. (See, also, Crimswal Realty Corp. v. State of New York, 27 A D 2d 350.)
Gross profits, of course, may be shown as they relate to the highest and best use of claimant’s property. (Banner Milling Co. v. State of New York, 240 N. Y. 533; Burdick v. State of *405 New York, 276 App. Div. 1052, affd. 302 N. Y. 670.) We have considered Mr. Purdy’s testimony relative to gross profits as it applied to subject property’s highest and best use. We reserved decision upon the State’s motion to strike all of the Purdy testimony. We deny said motion, as it is not possible to clearly extract the competent testimony from that which was incompetent. We have explained the weight given to such testimony. We should also state at this point that we gave very, little weight to the testimony presented by Mr. Lewis, the State’s alleged economic Theme Park expert. In our opinion, his, or his associates, examination of subject property was at best sketchy; and, at the worst, carelessly executed. In Exhibit “ D ”, Table VIII, Mr. Lewis set forth the estimated population of the resident market, 1960-1975. The following table, which relates only to 1960, sets forth his figures, the census figures as reported in the Legislative Manual for the State of New York and the counties which, according to said Manual, had the population figures which Mr. Lewis assigned to his chosen counties.
Leg. Manual Correct Counties : Figures Lewis Figures Lewis Figures Clinton 72,722 47,322 Columbia Essex 35,300 44,742 Franklin Franklin 44,742 51,304 Fulton Hamilton 4,267 66,370 Herkimer Saratoga 89,096 152,896 Schenectady Warren 44,002 48,476 Washington Washington 48,476 67,989 Wayne for
Furthermore, to state that only 12 acres of subject property were required for the developed Theme Park was to completely ignore the actual use being made of the Theme Park property east of the Schroon River.
There was one area of complete agreement in this capably and severely contested claim. A Theme Park must add one or more new attractions at least every two years, if it is to survive and retain its economic integrity. This fact points up the value of the Palmer Pond section taken by the State of New York. Not only did said area form a spectacular backdrop for the Frontier Town attractions east of the Schroon River; not only did it provide gravel, topsoil, and water for the operation of the whole Theme Park; but it also provided an expansion area for new Theme Park attractions of exceptional potential. In arriving at our market value for this area prior to the appropriation, we have considered that approximately 40± acres of *406 land together with 18± acres of Palmer Pond Section to be eminently suitable for Theme Park use and have valued it on the same basis as the Theme Park land east of the Schroon River. The remaining 34.09± acres of rear mountainous land were valued as backup scenic land for the Theme Park use.
The fair market value for Area “A ”, before the appropriation was $48,840. The land, in this area, 134± acres enhanced by a sand pit, was valued at $11,840, and the gasoline service station and land improvements at $37,000. The service station improvement will undoubtedly be damaged by the diversion of traffic from Route 9 to Interstate 87. However, such damage is damnum absque injuria and not compensable. We do not find any other consequential damage to this area. We have assigned the same fair market value to this area after the appropriation.
The fair market value for Area “ B ”, before the appropriation was $837,759. The land in this area, 232.09± acres, was valued at $122,209. We assigned $600 an acre to the 198± acres of Theme Park land and $100 an acre to 34.09 ± acres of mountainous backup Theme Park land. The building and land improvements were valued at $715,550.
The State directly appropriated 92.683± acres in Area “ B ”, which included 58.593 ± acres of prime Theme Park Land, including Palmer’s Pond, at $600 an acre and 34.09± acres of backup Theme Park land at $100. The farmhouse, barn, and outbuildings, although not suitable for Theme Park use, had a residual value in place of $10,000 and the land improvements a value of $1,500. The dam had a value of $30,000 and the powerhouse and fixtures a value of $5,000. The total direct damage related to said Area “ B ” was $85,064. As the State reserved to the claimant the right to maintain its existing water supply system, we found no damage in that respect.
The direct taking in Area “ B ” consequentially damaged the remaining Theme Park land and improvements, excepting the motel and land improvements directly related thereto. The appropriation of this prime expansion area will make it necessary for the claimant to conduct its expansion program, which, as has already been stated, is absolutely vital to the continued success of Frontier Town east of the Schroon River. This will not only require claimant to disturb its balanced operation in existence in that area, but also such expansion will not have the quality that was available before the appropriation by virtue of Palmer Pond Section.
The State’s brief, Point II, dealt at some length with the proposition that frustration of future plans is not compensable.
(Tobin Packing Co. v. State of New York, 26 A D 2d 986, 987; *407 Benjamin v. State of New York, 31 A D 2d 579.) We do not consider that such has entered into our evaluation of the consequential damages sustained by subject property.
The proximity of Interstate 87 to the northwest portion of remaining Area “ B ” will also curtail effective expansion on that land. It is our opinion that $90,000 fairly represents the consequential damage caused by the appropriation.
The fair market value for Area “ C ”, before the appropriation, was $4,500. We assigned $3,000 to 6± acres of frontage development land and $1,500 to 35.91± acres of rear mountainous land.
In arriving at our before and after values, we have considered the comparable sales to the extent indicated in the body of our decision. We have considered the reproduction cost less depreciation of the many buildings and land improvements located on subject property. We have considered the gross sales and generally successful operation of the Theme Park developed and carried on over the years by the claimant. Finally, we have utilized our extensive viewing of subject property. It is our opinion that claimant will be able to continue a successful Theme Park operation on its remaining property. However, this will be lessened in quality and will become a more difficult and expensive operation to continue because of the loss of land west of the Schroon River and south of Blue Ridge Road; loss of the scenic beauty of the West Branch of the Schroon River; and, loss of the scenic beauty and multiple uses of Palmer’s Pond.
Claimant is awarded the sum of $179,564, with interest thereon from November 4, 1965 to the date of entry of judgment herein.