STATE of Missouri ex rel. STATE HIGH-
WAY COMMISSION OF MISSOURI,
Plaintiff-Respondent,

v.

ARMACOST MOTORS, INC., et
al., Defendants,

and

Airport-Auditorium Motel Corporation,
Defendant-Appellant.

Nos. KCD 27972 to KCD 27976.

Missouri Court of Appeals,
Kansas City District.

May 31, 1977.

Frank P. Sebree, Frederick Beihl, Richard D. Woods, Shook, Hardy & Bacon, Kansas City, for defendant-appellant, Airport-Auditorium Motel Corp.

Earl H. Schrader, Jr., Asst. Counsel, Missouri State Highway Commission, Kansas City, for plaintiff-respondent.

Before WASSERSTROM, P. J., and SOMERVILLE and TURNAGE, JJ.

PER CURIAM.

As eventually becomes apparent, this case has had a hoary history. Airport-Auditorium Motel Corporation (hereinafter referred to as condemnee) appeals from five judgments entered by the trial court on March 17, 1975, for damages for the taking of five parcels of land in their entirety in a condemnation action initiated by the State of Missouri on the relation of the State Highway Commission of Missouri (hereinafter referred to as a condemnor). One broad pervasive issue is common to each appeal and the five separate appeals have been consolidated for purpose of appellate disposition. Briskly stated, condemnee claims the trial court erred in not treating the five parcels of land as a single assembled tract for the purpose of assessing condemnee's damages.

The key facts are both numerous and somewhat complicated. In 1951 the City Planning Commission of Kansas City, pursuant to a contract with the State Highway Commission of Missouri, published and widely disseminated a book entitled "Expressways of Greater Kansas City." Among other things it set forth the proposed route of what has been commonly referred to as the Crosstown Freeway Project. Condemnee's chief executive offi-

cer admitted that he had knowledge of the contents of the book entitled "Expressways of Greater Kansas City" before condemnee acquired any of the five parcels of land, and therefore condemnee had prior knowledge that slightly less than one-half of the combined area of the five parcels of land, which condemnee subsequently acquired, lay in the path of the proposed route of the Crosstown Freeway Project. Title to four parcels of land vested in condemnee in February and March of 1963 and title to the fifth parcel of land vested in condemnee in April of 1963. No effort was made by condemnor to contact condemnee for the purpose of negotiating acquisition of the latter's property until the interim between the vesting of title to the first four parcels and the fifth parcel. Suffice it to say negotiations were not fruitful. Condemnor's petition for condemnation was filed August 27, 1963. Condemnee's chief executive officer disclaimed having had any knowledge that all five parcels of land would be condemned in their entirety until condemnee was served with a summons and copy of the condemnation petition. Certain evidence introduced by condemnor infers that condemnee had knowledge that condemnor proposed to condemn a majority of the area represented by the five parcels of land before their assemblage was completed. On the other hand, an overview of all the evidence reveals that condemnee's chief executive officer consistently expressed hope that changes and alterations in the proposed freeway project could or would be made whereby condemnee might retain sufficient acreage to go ahead with the commercial project for which the land was being assembled, and evidence appears in the record from which it can be inferred that this hope was not entirely misplaced.

The five parcels of land owned by condemnee were individually described in separate paragraphs of condemnor's petition. In addition to naming condemnee as defendant, the petition also named the city and county collectors and the trustees and beneficiaries of various deeds of trust as defendants.

The report of the commissioners was filed November 8, 1963. Separate amounts were fixed and awarded for each of the five parcels of land owned by condemnee. The separate amounts fixed and awarded by the commissioners, and the description and size of the various parcels to which they relate, are as follows:

Parcel 1: $144,000.00 (1426–32 Central—29,174.9 square feet)

Parcel 2: $85,200.00 (1433 Broadway—14,200 square feet)

Parcel 3: $60,300.00 (1425 Broadway—10,530.7 square feet)

Parcel 4: $60,375.00 (1417–23 Broadway—10,650 square feet)

Parcel 5: $31,650.00 (1415 Broadway—5,325 square feet)

The amounts awarded by the commissioners were apparently paid into court on November 8, 1963, as parties stipulated that the date of taking of the five parcels of land was November 8, 1963.

Condemnee filed exceptions to the Commissioners' Report as to all five parcels. Thereafter, by written motion (hereinafter referred to as motion to consolidate), condemnee moved the trial court "to consolidate all its exceptions into one action and try them together as exceptions relating to one assemblage leading to one verdict by the jury." An extensive evidentiary hearing was held in conjunction with the motion.

In addition to many of the facts heretofore mentioned, evidence introduced at the hearing further revealed the following facts deemed germane to the issue on appeal.

In 1953, condemnee, acting through "related" entities, launched efforts to acquire a tract of land in the general area in question which would be suitable for construction of a motel. The general area in question was selected as a prime location because of its proximity to the Municipal Auditorium located in "downtown" Kansas City. Throughout the remainder of the 1950's, condemnee's chief executive officer contacted over twenty motel and hotel operators, including the "Sheraton Corporation", the "Hilton Corporation", and the "Hotel Cor-

poration of America", regarding location, size, internal facilities and parking space for a successful motel operation. Additionally, he worked with several national real estate firms which specialized in hotel and motel developments. These efforts culminated in condemnee's acquisition of the five parcels of land which are the subject of this condemnation action.[1]

All five parcels of land were vacant and unimproved on the date of their taking and had been for some time prior thereto. All five parcels of land were contiguous although an alley ran between the four parcels of land which faced west and fronted on Broadway and the fifth parcel of land which faced east and fronted on Central. Moreover, all five parcels of land were in an area zoned M-1 (light industry) which permitted their use for motel purposes.

On October 27, 1971, the trial court denied condemnee's motion to consolidate. Shortly thereafter, condemnee delivered a letter to the trial court (treated by the trial court and the parties as a supplemental motion) wherein, as construed by the trial court, condemnee also asked the trial court to rule that "the various tracts of land may be enhanced in value because of the 'reasonable probability' of their being combined in the 'reasonably near future.' " On December 2, 1971, the trial court amended its original order denying condemnee's motion to consolidate and entered the following order:

"The order of this Court entered October 27, 1971, is amended to read as follows:

"Exceptions to the award of the Commissions for tracts mentioned in paragraphs 25.0, 26.0, 27.0, 28.0 and 29.0 of plaintiff's petition, in each of which defendant Airport-Auditorium Motel Corporation is alleged to own an interest, are consolidated for trial before one jury. *However, defendant's motion that the cases be tried as if all the land constitutes one single tract for the purpose of arriv-*

ing at values is overruled. The jury will be instructed to return a separate verdict with respect to each tract, and evidence rulings will be consistent with the above orders.

"Defendant's motion, in the form of a letter, filed November 15, 1971, that the Court rule that the various tracts of land may be enhanced in value because of the 'reasonable probability' of their being combined in the 'reasonably near future' is overruled. *The Court concludes that defendant knew, or should have known, that the land would be taken by plaintiff, before the parcels were combined in one owner, and before there was any relationship between the various owners that might give rise to the reasonable probability of their being combined in the reasonably near future.*

"This order is designated as a final order for the purpose of appeal." (Emphasis added.)

Condemnee took an appeal from the amended order to the Supreme Court of Missouri. *State ex rel. State Highway Comm'n v. Armacost Motors, Inc.*, 502 S.W.2d 330 (Mo.1973). Notwithstanding the trial court's designation of the order "as a final order for the purpose of appeal", the Supreme Court dismissed condemnee's appeal for lack of a final judgment for purpose of appeal.

After the case was relodged in the trial court, condemnor and condemnee executed a protracted "Stipulation" which, inter alia, preserved for purpose of appeal viability of the pervasive issue now presented. Condemnee's exceptions were bench tried pursuant to the "Stipulation" and five judgments were entered, one as to each parcel of land. Each judgment awarding damages was rendered solely in favor of condemnee. As the amount awarded to condemnee in each of the five judgments was less than the respective amount fixed by the commissioners in their report, the trial court entered judgment in favor of condemnor and

---

1. Evidence reflecting the facts set forth in this paragraph, as well as evidence of a comparable vein, is considered solely with regard to the bearing it may have on the question of condemnee's good faith in acquiring the five parcels of land.

*solely against condemnee* for the amount by which each judgment in favor of condemnee and against condemnor exceeded the amount of damages respectively fixed by the Commissioner's Report "with interest" thereon "at the rate of six per cent (6%) per annum from and after January 1, 1964." Condemnor did not appeal from any of the five judgments entered by the trial court.

Disposition of this appeal is aided by first posing and answering a hypothetical question. If condemnee had completed assembling the five contiguous, vacant and unimproved parcels of land into one ownership prior to any announcement that they lay in whole or in part in the path of the proposed freeway, and thereafter they became the subject of condemnation in their entirety, would condemnee have been entitled to have the five parcels of land treated as a single assembled tract for the purpose of assessing damages for their taking? This court concludes, for the following reasons, that this question must be answered in the affirmative.

█ By constitutional mandate, Article I, § 26, Constitution of Missouri, 1945, "private property shall not be taken . . . for public use without just compensation." Drawing upon this constitutional mandate and a long line of case authority, MAI 9.01 (used where property is taken in its entirety) reflects that the measure of "just compensation" is the "fair market value" of the property immediately before its taking. In determining "fair market value" a jury is advised that it "should take into consideration all the uses to which the property may best be applied or for which it is best adapted, under existing conditions and under conditions to be reasonably expected in the near future." MAI 16.02 (also drawing upon the constitutional mandate, supra, and a long line of case authority).

█ Broadly speaking, plottage is a recognized concept in the field of eminent domain. Although neither party has addressed the issue at hand in terms of plottage, it necessarily courses throughout by implication. Notwithstanding the fact that

no Missouri cases speaking of plottage have been cited by the parties or disclosed by this court's independent search, it is recognized in other jurisdictions and by text authorities and the logic and reasons underlying it are sound and persuasive. Apposite this case, plottage refers to an added increment of value which may accrue to two or more vacant and unimproved contiguous parcels of land held in one ownership because of their potentially enhanced marketability by reason of their greater use adaptability as a single unit; simplistically stated, an assemblage of vacant and unimproved contiguous parcels of land held in one ownership may have a greater value as a whole than the sum of their values as separate constituent parcels; and plottage value may be considered in determining damages, i. e., "fair market value", when two or more vacant and unimproved contiguous parcels of land held in one ownership are taken in their entirety by exercise of the power of eminent domain. See: 4 Nichols on Eminent Domain, 12–425, § 12.35 (3rd rev. ed., 1976); 1 Orgel, Valuation Under the Law of Eminent Domain, 168–70, § 35 (2d ed. 1953); *U. S. v. 49,375 Square Feet of Land*, 92 F.Supp. 384, 391 (S.D.N.Y.1950); *U. S. v. 29,930 Square Feet of Land*, 49 F.Supp. 383, 385–86 (E.D.N.Y.1943); *In re Armory Board*, 73 App.Div. 152, 76 N.Y.S. 766, 767–68 (1902); and *In re Certain Lands in City of New York*, 127 Misc. 710, 217 N.Y.S. 544, 563 (Sup.Ct.1926). The term "plottage value" and the term "assemblage value" are sometimes used interchangeably. *Arkansas State Highway Comm'n v. Witkowski*, 257 Ark. 659, 519 S.W.2d 743, 746 (1975); and *State v. Sauls*, 234 La. 241, 99 So.2d 97, 102 (1958).

█ The mere presence of an alley between the four parcels of land facing Broadway and the one parcel of land facing Central did not destroy their contiguity. *Public Water Supply Dist. No. 2 v. Alex Bascom Co.*, 370 S.W.2d 281, 285 (Mo.1963).

When the facts hypothesized in the previous question are juxtaposed with the concept of plottage, treatment of the five parcels of land as one unit leading to a single

verdict for the purpose of assessing damages would accord with "fair market value" in the sense employed in MAI 9.01 and MAI 16.02, supra. From the standpoint of the trier of facts, doing so would facilitate assessment of the overall damages to which condemnee would be entitled for the taking of all five parcels of land in their entirety and the orderly presentment of all cognizable matters appertaining to "fair market value", as determined by and subject to applicable principles of law and rules of evidence, which infuse all five parcels of land. A fragmented presentation of such matters would be confusing and disoriented.

A crucial factual question must now be posed and answered. As condemnee acquired all five of the parcels of land prior to condemnor's institution of condemnation proceedings, though after obtaining knowledge that they lay, at least in part, in the path of the proposed Crosstown Freeway Project, is condemnee barred from having the five parcels of land treated as a single unit for the purpose of assessing damages when taken in their entirety? This question, at least in part, raises one of many legal conundrums associated with premature announcements of condemnation.

Condemnor vigorously argues that condemnee's acquisition of the five parcels of land after acquiring knowledge that they lay in whole or in part in the path of the proposed Crosstown Freeway Project vitiated condemnee's claimed right to have the five parcels of land considered as a single unit for the purpose of assessing damages for their taking. The thrust of condemnor's argument being that the five parcels of land could never be used in combination because of the impending Crosstown Freeway Project. It is parenthetically noted that the same argument, if carried to its extreme, would enable a condemnor to contend that a condemnee who acquired a single parcel of land under matching circumstances would not be entitled to have its best use "under conditions to be reasonably expected in the near future" considered in determining its "fair market value". Condemnor further argues that condemnee assembled the five parcels of land in "bad faith" and therefore should be deprived of any enhanced value that might attach by treating them as a single unit.

While the arguments tendered by condemnor have not been ruled on in this state in the context in which they are presently invoked, cases dealing with comparable, and in a broad sense, analogous situations exist, which this court deems applicable and controlling.

■ A premature announcement of condemnation falls short of an irrevocable commitment to exercise the power of eminent domain. In fact, condemnor in the instant case, for example, could have abandoned the condemnation proceeding, which was initiated some ten years after being prematurely announced, any time within ten days after the commissioners' report assessing damages became final. Rule 86.06. An area touched by a premature announcement of condemnation is under a pall of condemnation blight and property owners therein, or would-be property owners therein, are literally "between a rock and a hard place". The threat of condemnation proceedings is not an element of damages for a taking in condemnation. *State ex rel. State Highway Comm'n v. Samborski,* 463 S.W.2d 896, 903 (Mo.1971); *St. Louis Housing Auth. v. Barnes,* 375 S.W.2d 144, 147 (Mo.1964); and *State ex rel. City of St. Louis v. Beck,* 333 Mo. 1118, 63 S.W.2d 814, 817 (banc 1933). On the other hand, property owners who rely on premature announcements of condemnation which are later abandoned have no recourse against a prospective condemnor. *Hamer v. State Highway Comm'n,* 304 S.W.2d 869 (Mo.1957). Consequently, premature announcements of condemnation do not freeze all movement of property in an affected area. Those possessing the power of eminent domain have successfully argued and established on previous occasions that evidence of the sale price of property sold to one other than condemnor after proposed condemnation has been publicly announced is admissible. The rationale thereof is succinctly stated in *Kansas City v. Boruff,* 295

Mo. 28, 243 S.W. 167, 169 (banc 1922): "The land was upon the open market. The owner had the right to sell, and the purchaser the right to buy." Condemnor in the instant case successfully advanced the same argument in *State ex rel. State Highway Comm'n v. Rauscher Chevrolet Company,* 291 S.W.2d 89 (Mo.1956). As evidenced by past litigation to which condemnor has been a party, condemnor has persistently sought to shroud itself with insularity regarding all adverse effects of premature announcements of condemnation while, at the same time, seeking to burden condemnees with all unfavorable fallout therefrom.

*State ex rel. State Highway Comm'n v. Fenix,* 311 S.W.2d 61 (Mo.App.1958), is closely in point. There condemnor introduced evidence inferring that condemnee purchased property and began construction of a motel upon it despite knowledge of its proposed condemnation. The court held that since there was no evidence that condemnee acted in bad faith in purchasing the property and erecting the motel, a "false issue" was injected in the case and the trial court erred in admitting evidence of condemnee's prior knowledge of the proposed condemnation. The court struck at the heart of the matter, *State ex rel. State Highway Comm'n v. Fenix,* supra, at 64, with the following statement: "Having logically maintained and successfully established in the *Hamer* case, supra, that it may not be penalized as a result of advance disclosure of plans for a highway project, the Commission may not, now that the boot is on the other foot, penalize the landowner by reason of such advance disclosure."

■ Condemnor in the instant case seeks to infer that condemnee assembled the five parcels of land to enhance their litigation value. In its brief, condemnor likens condemnee's assemblage of the five parcels of land to "the modern equivalent of salting the gold mine". *Frontier Town Properties, Inc. v. State,* 58 Misc.2d 388, 296 N.Y.S.2d 90, 105 (Ct.Cl.1968), pithily holds that "[d]emonstrable bad faith" is required to sustain an argumentative inference raised by a condemnor that a condemnee

has acquired property in the path of a prospective condemnation project for the purpose of litigation value. This state hews to the general principle that a presumption exists that acts are performed in good faith. *State v. Tillatson,* 312 S.W.2d 753, 757 (Mo. banc 1958). A careful review of various exhibits and portions of evidence relied upon by condemnor fails to overcome this presumption or measure up to "demonstrable bad faith" on the part of condemnee in assembling the five parcels of land. Although all the evidence viewed in its entirety may well suggest that a more cautious person would not have engaged in an effort to assemble the five parcels of land under the existent circumstances, such lack of caution does not bear out condemnor's charge of bad faith. Moreover, the trial court bottomed its ruling on condemnee's motion to consolidate and treat the five parcels of land as one unit for the purpose of assessing damages solely on the fact that condemnee "knew, or should have known that the land would be taken by plaintiff [condemnor], before the parcels were combined in one owner, and before there was any relationship between the various owners that might give rise to the reasonable probability of their being combined in the reasonably near future". Such knowledge on the part of condemnee, standing alone, does not subject condemnee to the brunt of a penalty as urged by condemnor. As the trial court did not so much as intimate or hint that condemnee was guilty of "demonstrable bad faith", this court is impelled to conclude that in light of all the evidence condemnee was entitled to have all five exceptions consolidated and the five parcels of land treated as one unit for the purpose of determining their fair market value.

■ One final issue, raised by condemnor, requires attention. Condemnor contends that if a single verdict for damages is returned in an amount less than the combined total of the separate amounts fixed by the commissioners in their report, it would be impossible to determine where and in what amounts liability would attach regarding the excess, all to condemnor's

irreparable harm and prejudice.[2] Condemnor hypothesizes that some or all of the original named defendants other than condemnee might be liable for some portion of any excess that might theoretically arise. The issue which condemnor seeks to raise is purely abstract because the record fails to disclose that any of the other named defendants withdrew any part of the money paid into court by condemnor in response to the commissioners' report. The only inkling that the money was withdrawn is reflected by the judgments entered by the trial court which indicate that all the money representing the commissioners' awards was withdrawn solely by condemnee. Thus, the state of the record relegates the issue sought to be raised by condemnor in this case to a non-justiciable status. This court is quick to acknowledge that the abstract issue raised by condemnor involves virtually unlimited peripheral and core issues, albeit imaginary in this case, never addressed in any of the briefs. Assuming, arguendo, that the presently abstract issue ripens into reality in a future case, this court suggests, but expressly refrains from holding, that the debacle envisioned by condemnor could be obviated by fixing respective liabilities for any excess among individual defendants on the same percentage basis which the amount of each individual defendant's distributed portion of the commissioners' award bears to the sum total of all the commissioners' awards paid out for each and every parcel subsumed by a single jury verdict, such being consistent with and permitting application of the formula prescribed by § 523.053.3, RSMo 1969.

Reversed and remanded for a new trial in conformity with this opinion.

All concur.

---

**2.** Condemnor relies on *State ex rel. State Highway Comm'n v. Commonwealth Drive-In Theatres, Inc.*, 413 S.W.2d 526 (Mo.App.1967). A reading of said case reveals that the facts therein are inapposite the case at hand.